Rowe v. Ray
Civil Action No. 3:19 cv 418

# EXHIBIT A

In the Matter Of:

UHURU ROWE v. 3:18 HAROLD C. CLARKE

## LT. CARPENTER

*May 31, 2019*

*Halasz Reporting & Video  |  804.708.0025*
*PO Box 1644  Richmond, VA 23218-1644*

1     UNITED STATES DISTRICT COURT

2     IN THE EASTERN DISTRICT OF VIRGINIA

3     RICHMOND DIVISION

4

5     UHURU ROWE,
              Plaintiff,
                                          Case No.
6     v.                                  3:18cv780

      HAROLD C. CLARKE, et al.,
7             Defendants.

8

9     DEPOSITION OF LT. MICHELLE CARPENTER

10

11     May 31, 2019

12     Greensville, Virginia

13

14     HALASZ REPORTING & VIDEO

15     1011 East Main Street, Suite 100

16     RICHMOND, VA   23218-1644

17     (804) 708-0025

18

19     Reported by:  Cynthia G. Shortlidge

20     Halasz Reporting & Video | 804.708.0025
       PO Box 1644  Richmond, VA 23218-1644

21

22

23

24

25

UHURU ROWE v. 3:18 HAROLD C. CLARKE
CARPENTER, LT. on 05/31/2019

Page 2

```
 1            Deposition of LT. MICHELLE CARPENTER, taken by and
 2   before Cynthia G. Shortlidge, Notary Public in and for the
 3   Commonwealth of Virginia at large, pursuant to Rule 4:5 of
 4   the Rules of the Supreme Court of Virginia, and by Notice to
 5   take Deposition, commencing at 1:40 p.m., May 31, 2019, at
 6   the Greensville Correctional Center, 901 Corrections Way,
 7   Jarratt, VA 23870.
 8
 9   APPEARANCES:
10
11           BY:  JEFFREY E. FOGEL, ESQUIRE
12           attorney, of counsel for the Plaintiff
13           (9113 E. Jef UHURU ROWE v. 3:18 HAROLD C. CLARKE
                          CARPENTER, LT. on 05/31/2019
14               Charlottesville, VA  22902)
15
16           OFFICE OF THE ATTORNEY GENERAL
17           BY:  LAURA MAUGHAN, ESQUIRE,
18           ASSISTANT ATTORNEY GENERAL
19           attorney, of counsel for the Defendant
20           (202 N. 9th Street, 6th Floor,
21               Richmond, VA  23219)
22
23
24
25
```

Page 3

```
 1                   I N D E X
 2   Deponent:          Examination by:         Page:
 3   Lt. Michelle Carpenter     Mr. Fogel          4
 4                      Ms. Maughan        52
 5                      Mr. Fogel          62
 6
 7
 8
 9
10
11
12
13                      Halasz Reporting & Video | 804.708.0025
14                      PO Box 1644  Richmond, VA 23218-1644
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                   LT. MICHELLE CARPENTER
 2              was sworn and deposed as follows:
 3                       EXAMINATION
 4
 5   BY MR. FOGEL:
 6
 7       Q.   Lieutenant Carpenter, I think you know that I am
 8   Mr. Rowe's lawyer in this case?
 9       A.   Yes, sir.
10       Q.   Have you ever been deposed before?
11       A.   No, sir.
12       Q.   Did you listen to the instructions that your lawyer
13   gave to my client?
14       A.   Yes, sir.
15       Q.   Did you understand them?
16       A.   Yes, sir.
17       Q.   Do you have any questions about that now?
18       A.   No, sir.
19       Q.   How we perform this?  Thank you.
20            You are employed by the Virginia Department of
21   Corrections, correct?
22       A.   Correct.
23       Q.   In what capacity?
24       A.   Institution investigator.
25       Q.   Are you assigned to a particular institution?
```

Page 5

```
 1       A.   Yes, sir.
 2       Q.   Which one is that?
 3       A.   Sussex 2 State Prison.
 4       Q.   And how long have you been an institution
 5   investigator at Sussex 2?
 6       A.   Since October 2017.
 7       Q.   And prior to that time where were you employed?
 8       A.   I was an intel officer in the same unit at Sussex 2
 9   State Prison.
10       Q.   What's the difference between what your job is now
11   and being an intel officer?
12       A.   Intel officer I monitor phone calls.  Institution
13   investigator they do more investigation than the intel
14   officer actually does.
15       Q.   Then tell me what your responsibilities were.
16       A.   For which one?
17       Q.   As of now.
18       A.   As of now?
19       Q.   Since October 2017.
20       A.   I'm the lead investigator.  Right now I have two
21   intel officers.
22       Q.   And what do you do?
23       A.   I investigate stuff within the Department of
24   Corrections and outside the Department of Corrections.
25       Q.   Do you investigate prisoners' conduct?
```

Page 6

```
1     A.   Yes, I do.
2     Q.   Do you investigate staff conduct?
3     A.   Yes, I do.
4     Q.   And you investigate that conduct both outside as
5  well as within the prison walls?
6     A.   Correct.
7     Q.   And you do those investigations about prisoners
8  outside the walls?
9     A.   Correct.
10    Q.   As well as employees?
11    A.   Correct.
12    Q.   When did you first become aware of the existence of
13 Mr. Rowe?
14    A.   I want to say it was 2018 in March.
15    Q.   And how?
16    A.   February or March.
17    Q.   And how did he come to your attention?
18    A.   Through a petition and some blogs going out.
19    Q.   Okay.  Tell me about the petition?
20    A.   It was a petition going around dealing with riots.
21    Q.   Dealing with them in what respect?
22    A.   Inside of the institution.
23    Q.   There was a petition going around dealing with riots
24 inside the institution?
25    A.   Yes, and --
```

Page 7

```
1     Q.   Discouraging them?
2     A.   Correct.
3     Q.   Discouraging them?
4     A.   Correct.
5     Q.   Who was circulating that petition?
6     A.   Who was circulating?
7     Q.   Yes.
8     A.   It was several offenders.
9     Q.   And were they asking for something?
10    A.   No, they were talking about riot for not eating
11 chow, going to sit down stuff like that, officers were going
12 to get hurt.
13    Q.   Don't riot?
14    A.   Yes.
15    Q.   And was there any connection to Mr. Rowe with that
16 petition?
17    A.   I can't recall if he signed it.  I can't recall if
18 he was involved in that riot or not within that time frame.
19    Q.   Was there ever a riot?
20    A.   No, it was not a riot, to set up a riot.
21    Q.   I thought you said there was -- the thing was not to
22 riot?
23    A.   They was trying to set up a riot for not to go to
24 chow to eat.  It was like a petition going around.
25    Q.   Okay.  My question was how did you become aware of
```

Page 8

```
1  Mr. Rowe's existence in March of 2018.  You started off
2  telling me about a petition.
3     A.   Correct.
4     Q.   Tell me about what Mr. Rowe's connection is to that
5  petition.
6     A.   It was a petition going around.  Mr. Rowe did sign
7  the petition, that he admitted to signing the petition that
8  was going around.  He didn't know what it was for.  And I
9  have seen the copy of the petition and everything and
10 Mr. Rowe did sign it.
11    Q.   Okay.  How many other people signed it?
12    A.   It was numerous offenders.
13    Q.   Pardon?
14    A.   It was several offenders.
15    Q.   Three, 300?
16    A.   I'm going to say a good 40, 45.
17    Q.   And how did you become aware of that petition?
18    A.   By searching offender Pughsley's property.
19    Q.   And when did you -- did you get the petition from
20 his property?
21    A.   Yes, sir, we did.
22    Q.   And that's where you saw Mr. Rowe's name?
23    A.   Yes, sir.
24    Q.   Among approximately 40 other people?
25    A.   Correct.
```

Page 9

```
1     Q.   Was there anything special about Mr. Rowe's name
2  among those 40?
3     A.   No, sir, his name and state number was beside where
4  his signature was.
5     Q.   Do you still have that petition?
6     A.   Do I have it?
7     Q.   Yeah.
8     A.   Yes, I do have it in my file.
9     Q.   Okay.  I would ask that that be produced.  Any
10 problem?  Let me know if there's a problem.
11    MS. MAUGHAN:  I think it would be best if you want
12 to make a document production request just do it all at once.
13 If you want to rely on my notes.
14    Q.   So when you saw Mr. Rowe's name there, did it stand
15 out in any way as compared to other approximately 40?
16    A.   Not until he started sending blogs out, and it was
17 brought to our attention that they had seen Mr. Rowe's blog
18 on the internet.
19    Q.   Prisoners are allowed access to the internet at
20 Sussex 2, are they not?
21    A.   No, they're not.
22    Q.   They're not allowed on the internet?
23    A.   No, they're not.
24    Q.   Are they allowed a JPay?
25    A.   Yes, sir.
```

UHURU ROWE v. 3:18 HAROLD C. CLARKE
CARPENTER, LT. on 05/31/2019

**Page 10**

1   Q.   Isn't JPay connected to the internet?

2   A.   No, it's connected to a kiosk machine.

3   Q.   How does JPay communicate with somebody outside the
4   institution?

5   A.   They connect their JP5 player to the kiosk and
6   transfer.  It's not internet access for them to actually just
7   sit there and go on the internet and pull up anything.

8   Q.   Right.  But they can communicate with others through
9   the Internet?  That's an Internet connection, is it not?

10   A.   Yes, it is an internet connection, but I thought you
11   meant something for computer internet access.

12   Q.   It's only good for e-mails?

13   A.   Correct.

14   Q.   And who has access to that operation, the JPay, any
15   prisoner?

16   A.   Yes, as long as they have a JP 5 player.

17   Q.   Meaning that they bought one?

18   A.   Yes, so they can get up there now and actually just
19   type if they don't have one.

20   Q.   Now, you became aware you said of certain blogs?

21   A.   Yes, sir.

22   Q.   How did you become aware of them?

23   A.   It was brought to our attention by Ms. Ryan.

24   Q.   Who's Ms. Ryan?

25   A.   She was a teacher that teaches commercial arts I

**Page 11**

1   want to say at Sussex 2 State Prison.

2   Q.   And she told you something?

3   A.   She came to my intel officer and was telling my
4   intel officer about the blog that was going through the
5   Internet.

6   Q.   What did she tell her?

7   A.   She told her that she believed Mr. Rowe had a blog
8   page going that she needed to go up there and check it out
9   and looked at it.

10   Q.   She as the art teacher?

11   A.   The commercial art told my intel officer that she
12   needs to check Offender Rowe's blog that he had on the
13   Internet, and she gave her the website to where the blog was
14   posted on.

15   Q.   Do you know what Ms. Ryan's interest was in this
16   matter?

17   A.   She was looking up something for her class.

18   Q.   And what did she say?

19   A.   She ran across Offender Rowe's information on the
20   blog that she was actually on.

21   Q.   Did she tell your intel officer anything about the
22   content of those blogs?

23   A.   Did I tell?

24   Q.   Did Miss Ryan tell your intel officer anything about
25   the content of those blogs?

**Page 12**

1   A.   No.  She just said it was very interesting, that she
2   needs to go up there and read it.

3   Q.   Did she say why?

4   A.   She did not say why.

5   Q.   When someone comes to your office and says I think
6   it's interesting, you should read it --

7   A.   She did not come to me.  She told my intel officer.
8   So whether they discussed it or not I have no answer for
9   that.

10   Q.   Okay.  So do you give any instructions to your intel
11   officers?

12   A.   Yes, I do.

13   Q.   About when they should investigate things and when
14   not?

15   A.   Yes.  And when she got the information she called
16   Ms. Brickhead, which is the operational manager, she's up
17   under Warden, and she conducts further supervises the mail
18   room, like incoming and outgoing mail.  And she contacted her
19   and let her know the information she had just received.

20   Q.   From?

21   A.   From Ms. Ryan.

22   Q.   So Ms. Brickhead also received information from Ms.
23   Ryan?

24   A.   No, Ms. Brickhead received information from my intel
25   officer.

**Page 13**

1   Q.   And what did Ms. Brickhead say in response to
2   that?

3   A.   Once they read the blog and then sent the JPay
4   e-mail out, Ms. Brickhead instructed my intel officer to send
5   it to censor.

6   Q.   So say after they read the blog?

7   A.   Yes.

8   Q.   How did you get access to the blog?

9   A.   We have internet access, sir.

10   Q.   So you had the URL address for the website?

11   A.   Yes.

12   Q.   And you typed that?

13   A.   Yes.

14   Q.   And who was present at that time, you were?

15   A.   Ms. Ryan and my intel officer.

16   Q.   Does Ms. Ryan have anything to do with intelligence
17   at the prison?

18   A.   No, she does not, but if it's something dealing with
19   the stuff that was inside of the content dealing with the
20   prison she brought it to our attention.

21   Q.   Is she allowed to see E-mails that are sent out by
22   prisoners?

23   A.   No, she's not.  She didn't know anything about him
24   sending out JPay e-mails.

25   Q.   So all she knew was that he had a blog?

UHURU ROWE v. 3:18 HAROLD C. CLARKE
CARPENTER, LT. on 05/31/2019

**Page 14**

1    A.    That he had a blog, and she brought it to our
2  attention.  And when he sent the JPays out, that's when we
3  was instructed to stop and send those to censor.
4    Q.    Was there any concern in your mind about the fact
5  that he had a blog?
6    A.    Was there in anything what?
7    Q.    Concern in your mind about Mr. Rowe having a blog?
8    A.    No.
9    Q.    Well, then why are we looking at this?
10    A.    I wasn't looking at it, it was brought to our
11  attention about the blog.  Our concern was the JPays that
12  were being sent out.  The blogs, no, but the JPays that were
13  being sent out, yes, we were concerned about some of them.
14    Q.    Did you read any of them?
15    A.    The JPays?
16          Yes, I did.
17    Q.    How do you do that mechanically?
18    A.    I log onto JPay from my facility.
19    Q.    And?
20    A.    The list comes up where everyone's sending out
21  JPays, and we go through each one of them and read them.  We
22  have certain ones that we select and read, and the ones we
23  read and send them on.
24    Q.    On a regular basis?
25    A.    Regular basis.

**Page 15**

1    Q.    And are those kept in a storage unit in the JPay?
2    A.    Yes, it's sent to, it goes to security then it goes
3  to censor.
4    Q.    So you could get -- one could get that from it now,
5  years past?
6    A.    Yes.
7    Q.    Things that have been censored you can get access
8  to?
9    A.    Yes.
10    Q.    Now, I take it you're familiar with the operating
11  procedure 803.1?
12    A.    Yes, sir.
13    Q.    Titled "Offender Correspondence"?
14    A.    Correct.
15    Q.    Now, is there a distinction in your mind or you've
16  been trained between letters going out by prisoners and
17  letters coming in from people on the outside?
18    A.    Correct.
19    Q.    And what distinction do you draw as an intelligence
20  officer?
21    A.    What do I draw from it?
22    Q.    Yes.
23    A.    Mail that's going out we're allowed to read mail
24  that's going out to be suspicious as long as we have a mail
25  cover on them.  Mail that's coming in if we have mail covered

**Page 16**

1  on them we're allowed to receive that mail also.  Once we've
2  read the mail going out, the mail is sent out through the
3  mail.
4    Q.    Okay.
5    A.    Mail that's coming in once we've read it, mail goes
6  directly to the offender at night --
7          (Court reporter asks witness to repeat response).
8    A.    The mail is coming in, mail is coming in and we have
9  a mail cover on the offender, we will read that mail.  Once
10  we have read and everything is fine with the letter, it's
11  sent in to the offender for night time mail to be passed out.
12  Daytime mail is sent to the mail room, we read the mail.
13  Once we're fine with the content, if it's something w need to
14  hold we make a copy of it.  Once we make a copy of it it's
15  sent back to United Postal Service.  We do not hold the
16  offender's mail.
17    Q.    So can you read every E-mail that's sent out through
18  JPay?
19    A.    Can we read every last one?  Yes we can read every
20  last one of them.
21    Q.    There's no standard for when you get to rad?
22    A.    What do you mean no standard?
23    Q.    Is there any -- you can read any E-mail that's sent
24  out through JPay?
25    A.    Correct.

**Page 17**

1    Q.    You don't need any suspicion anything?
2    A.    No, sir.
3    Q.    But you are familiar with 803.1, are you not?
4    A.    Correct.
5    Q.    And are you familiar with this provision, "Outgoing
6  mail should not generally be searched unless there is a
7  reason for suspicion"?
8    A.    Correct.  That's why I say you have to have a mail
9  cover for mail being sent out.  You have reasonable
10  suspicions they'll have mail covers placed on the offender's
11  mail and it's been held for me to go through with permission
12  for his mail to be read, anything suspicious.
13    Q.    You said you could read the E-mail of anybody in the
14  institution.  Is everyone suspicious?
15    A.    E-mail is Jpay.
16    Q.    Right.
17    A.    Correct.
18    Q.    Is everybody suspicious?
19    A.    No, it's not suspicious, but JPay and regular mail
20  is totally different.
21    Q.    So JPay you can read whatever you want, but regular
22  mail you can't?
23    A.    No, sir.  JPay is just like regular mail going out.
24  Mail that's going out through the institutional mail, as long
25  as I have that letter stating that I can hold that mail and

UHURU ROWE v. 3:18 HAROLD C. CLARKE
CARPENTER, LT. on 05/31/2019

**Page 18**

1  search that mail at any given time, I have reasonable
2  suspicion to read that mail. All the JPays you can't read
3  them, but if I go and have one that I have mail covers on or
4  have reasonable suspicions of, those are the ones that are
5  being read.
6      Q.  So you get a letter from whom?
7      A.  It's a letter from that we have for mail cover. It
8  has to be signed and approved.
9      Q.  By who?
10     A.  The Warden.
11     Q.  And what is he approving?
12     A.  He's approving me to hold incoming and outgoing for
13  reasonable suspicions like ongoing investigations.
14     Q.  For specific prisoners?
15     A.  Correct.
16     Q.  How often does he give it to you?
17     A.  Whenever I fill it out and take it to him to have it
18  signed. See, when I take it to him --
19         (Court reporter asks witness to slow down)
20         MS. MAUGHAN:  Take a breath and slow down.
21     A.  I fill out the form with Offender Rowe, and I have
22  pending -- conducting investigation. Once I do that I send
23  it up front, put it in the Warden's box, wait for him to sign
24  it. Once he's signed off on it the mail room gets a copy and
25  I get a copy.

**Page 19**

1      Q.  And what, with that armed with that letter?
2      A.  That gives me permission to read incoming and
3  outgoing mail.
4      Q.  E-mail?
5      A.  Outgoing and incoming mail regardless of what kind
6  of mail it is, it's incoming or outgoing I have permission to
7  read it.
8      Q.  Okay. But is there permission to read outgoing
9  E-mails subject to that list of suspicious persons?
10     A.  Yes, it is.
11     Q.  So you can look at every JPay?
12     A.  I can look at every, but I'm not sitting there
13  reading every JPay. If I have reasonable suspicion of an
14  offender I have my paperwork stating giving me permission to
15  read his incoming and outgoing mail.
16     Q.  Okay. And did you do that with respect to
17  Mr. Rowe?
18     A.  Yes, I did, sir.
19     Q.  And can you tell me why?
20     A.  Because I had ongoing investigation on him from the
21  blog and the information that my intel officer received from
22  Ms. Ryan.
23     Q.  What was that information?
24     A.  That he had a blog, and then when she started
25  reading his JPays about the JPays, that's when I told her she

**Page 20**

1  need to do a mail cover to give us permission to keep track
2  of his JPays and giving us permission to read his incoming
3  and outgoing mail.
4      Q.  I'm a little confused. You said before you don't
5  care if he has a blog, correct?
6      A.  Correct.
7          The blog didn't have any anything to do with the
8  JPay. JPay is -- the blog is totally internet. JPay is an
9  E-mail. That's not a blog. It's a JPay e-mail going out. A
10  blog is where he sends it to someone else, just like a
11  letter.
12     Q.  Let's start off over.
13     A.  Okay.
14     Q.  Why were you suspicious of Mr. Rowe?
15     A.  Why I was suspicious of Mr. Rowe from the
16  information that my intel officer received from Mrs. Ryan.
17     Q.  Which was?
18     A.  Which was a blog letter that he had been sending out
19  putting on his blog page. Letter that he was being sent
20  out.
21     Q.  Without knowing the content?
22     A.  I didn't know the content. So once we learned about
23  Mr. Rowe having this blog, that's when I instructed my intel
24  officer who was going to put a mail cover on Mr. Rowe's
25  outgoing and incoming mail.

**Page 21**

1      Q.  And the only reason that was done was because you
2  learned that he had a blog?
3      A.  Correct, and the information that was pertaining on
4  the blog, the information that was on the blog like the
5  letters pertaining to different things that was going on in
6  the blog. That's where we stepped in. And then she started
7  reading the JPays, and some had been sent to censors because
8  of the content that was inside of the JPay E-mail.
9      Q.  What content?
10     A.  He's naming people, talking about deaths, Johnny
11  Trane's death, and he's just naming staff at the institution
12  which I thought was critical because we're here for public
13  and offender safety, and he's putting that on a blog.
14  You never know you walk out of an institution and that
15  person's family member or somebody standing out there waiting
16  for you to assault and hurt you. You never know. By putting
17  that on a blog and everybody has the option to read anything
18  on the internet as long as you have internet, and they come
19  there looking for a Mr. Mills, and because of Johnny Trane's
20  death he's putting his life in critical condition -- I mean
21  in harm's way.
22     Q.  How many people at the Sussex II have blogs? How
23  many prisoners?
24     A.  I have no knowledge, sir. I know Mr. Rowe had one
25  when he was there at Sussex 2 State Prison.

UHURU ROWE v. 3:18 HAROLD C. CLARKE
CARPENTER, LT. on 05/31/2019

**Page 22**

1   Q.   Do you know anybody else who had a blog?
2   A.   No, sir, I do not.
3   Q.   Did you check?
4   A.   No, sir, I did not.
5   Q.   Because?
6   A.   Because I was onto the one for --
7   Q.   So you looked at the content of the blog?
8   A.   Correct.
9   Q.   You didn't yet have a letter from Warden, did you?
10  A.   That was on the internet that I looked at.  I didn't
11  have to have a letter from the internet.
12  Q.   I understand.
13  A.   Correct.
14  Q.   So let's start again.  You looked, you found out he
15  had a blog?
16  A.   Correct.
17  Q.   You looked on that blog?
18  A.   Uh-huh.
19  Q.   You read some of the content?
20  A.   Yes.
21  Q.   You didn't yet have a letter from the Warden?
22  A.   No.
23  Q.   Allowing you to review his JPay, his --
24  A.   Correct.
25  Q.   So you then, armed with the information that he had

**Page 23**

1   a blog and the content of what you saw on that blog, you went
2   to the Warden and asked for a cover letter?
3   A.   I explained to him the information that we received
4   and I asked him --
5   Q.   Well, you telling me I told him about information --
6   A.   Yes.
7   Q.   -- it's meaningless to me.  I need to know what
8   information you told him.
9   A.   Okay.
10  Q.   So what did you tell him?
11  A.   I told him I had a mail cover letter that I need to
12  sign that I was putting a mail cover on Offender Rowe.
13  Q.   You don't have to tell him why?
14  A.   I had conducting investigation.
15  Q.   You don't have to tell him why?
16  A.   No, I did not.
17  Q.   You don't tell him why?  He signs a letter
18  authorizing you to look at suspicious E-mails but you don't
19  told him why you want to look at them?
20  A.   If I'm conducting an investigation, once I got all
21  my findings then I pass the information down to my Warden.
22  Q.   So the Warden gives you permission to review E-mails
23  without knowing why you want to review these E-mails, is that
24  correct?
25  A.   Correct.  I have reasonable suspicions to read any

**Page 24**

1   outgoing and incoming mail as long as I have permission to
2   sign.
3   Q.   Yes or no, the Warden does not know what suspicion
4   you have when you ask for that cover letter.  Is that
5   correct?
6   A.   Correct.
7   Q.   And when the Warden authorizes you, he doesn't know
8   why you want to do this, does he, except investigation?  He
9   doesn't know anything about the underlying reason for your
10  investigation?
11  A.   He was aware of this situation, sir.
12  Q.   How was he aware of it?
13  A.   Through my intel officer Ms. Brickhead.  Ms.
14  Brickhead was the operational manager.  My intel officer
15  passed the information down to Ms. Brickhead.
16  Q.   Information is not helpful to me.  Ms. Ryan passed
17  what to Ms. Brickhead?
18  A.   Ms. Ryan passed the blog information --
19  Q.   The fact that there was a blog --
20  A.   Correct.
21       MS. MAUGHAN:  Can you please let her finish?
22       MR. FOGEL:  I'm having trouble getting answers.
23       MS. MAUGHAN:  I'm going to object a little bit to
24  your tone.  I think if your tone was a little bit more polite
25  Ms. Carpenter could answer the questions.  Just slow it down

**Page 25**

1   a little bit, I think that would help everything.
2        MR. FOGEL:  Let's try.
3   Q.   Did she give him any other information other than
4   the fact that there was a blog?
5   A.   No.
6   Q.   And that's what Mr. -- what the Warden knew was that
7   there was a blog?
8   A.   It was about the blog.  And once we learned about
9   the blog we went to the JPays, and that's when we started
10  finding information about the JPays.
11  Q.   When you say about the blog, do you mean about the
12  existence of the blog?
13  A.   Correct.
14  Q.   Not about the substance of the blog?
15  A.   Correct.
16  Q.   So once you knew about the blog, you say you went to
17  look at some of the JPay E-mails?
18  A.   Correct.
19  Q.   But not until you had that cover letter, correct,
20  from the Warden?
21  A.   Correct.
22  Q.   The Warden knew that there was a blog?
23  A.   Correct.
24  Q.   Did he know anything else?
25  A.   Not at the time, no.

UHURU ROWE v. 3:18 HAROLD C. CLARKE
CARPENTER, LT. on 05/31/2019

**Page 26**

1   Q.   And as a normal matter you don't even tell him what
2   prompts your investigation, is that correct?
3   A.   Yes, I do tell him, yes.
4   Q.   Okay.  But you didn't in this Instance?
5   A.   Yes.
6   Q.   You did tell him?
7   A.   Yes.
8   Q.   What did you tell him?
9   A.   I learned that Mr. Rowe had the blog and I needed to
10  put a mail cover on him to gain more information.
11  Q.   Is that all you told him?
12  A.   Yes, until I started getting the JPay E-mails, and
13  once the JPay E-mails were put together as well that's when
14  they had my intel officer starts to censor.
15  Q.   You went in to look at the JPay E-mails after you
16  got the cover letter from the Warden?
17  A.   Correct.
18  Q.   And the Warden at that time was?
19  A.   Mr. Ray.
20  Q.   Do you recall approximately how soon after you spoke
21  to the Warden that you looked at these JPay E-mails?
22  A.   No, I don't recall.
23  Q.   Couple of weeks?
24  A.   About two or three days.
25  Q.   Okay.  And how many, do you recall how many you

**Page 27**

1   found?
2   A.   No, sir.
3   Q.   Okay.  You read through them?
4   A.   Yes.
5   Q.   All of them?
6   A.   No, I didn't go through all of them.
7   Q.   You went through -- how did you choose which ones to
8   go through?
9   A.   Because my intel officer had access, so all of us in
10  the unit, whichever ones we get to that's how we just go
11  through and do them.  We do different ones every day.
12  Q.   You did -- you picked out some to read?
13  A.   Okay, this is how it is.  When you have everyone that
14  has access to the JPay because it's in the intel department.
15  I might not be there today.  My intel officer might be there
16  today, so they will read the E-mail.  So they feel like this
17  needs to be sent to security, then it's sent over to
18  security.  And then it's sent over to censor and that's where
19  it stays at, in censor.
20  Q.   I'm still confused.
21       Did you read E-mails that were sent by Mr. Rowe?
22  A.   Yes, I have some of them.
23  Q.   Are you saying that one of your -- one of the people
24  who works for you also read E-mails?
25  A.   Yes.

**Page 28**

1   Q.   Do you know who that was and what E-mails they
2   read?
3   A.   No, I do not know which E-mails they read.
4   Q.   Do you know which E-mails you read?
5   A.   No, sir.
6   Q.   Do you take notes when you're reading these
7   E-mails?
8   A.   No, sir.
9   Q.   Did you pick out an E-mail to send to -- I think you
10  said if there's a problem you send it to security?
11  A.   Send it to security, correct.
12  Q.   Did you pick out any that you thought were a
13  problem?
14  A.   Yes, sir.
15  Q.   And can you tell us as best as you can recall what
16  the content was and why it was that you sent that particular
17  essay to security?
18  A.   I can't recall what date it was, but in one of those
19  JPays it was talking about staff.
20  Q.   Do you mean the names?
21  A.   Yes.
22  Q.   All right.
23  A.   Inside of content it had the staff names and talking
24  about offender's death, which was Johnny Trane I had spoke
25  about earlier.

**Page 29**

1   Q.   Anything else?
2   A.   And due to the content in the letter with the JPay
3   E-mail it was like putting staff and offenders' life in
4   jeopardy because you're naming these people and they have no
5   idea that this is actually being sent out.  They can go out
6   into society and something happens, and it was like it's not
7   a threat, but it was like harmful to them in harm's way for
8   being out in the community.
9   Q.   Have you run into that problem?
10  A.   What problem before, sir?
11  Q.   Of prisoners sending out mail or E-mails that have
12  the name of particular staff people in them?
13  A.   Yes, I have ran into it, but if it's not critical,
14  if I don't think it's critical then I don't send it.  If I
15  think it's critical then I do not send it out.  And the
16  E-mail that was being sent out I think was critical to staff
17  and the offender's family because they could have got wind of
18  it and found out who Mr. Mills, where he lived at and do harm
19  to him in the community.
20  Q.   How do you distinguish that particular communication
21  with the name of the staff member with the communications
22  that had staff member's names that you didn't censor or that
23  you didn't think was a problem?
24  A.   The ones that were censored had staff names in them.
25  I thought it had critical information that I thought would

UHURU ROWE v. 3:18 HAROLD C. CLARKE
CARPENTER, LT. on 05/31/2019

Page 30

1  being putting staff into harm's way.
2     Q.   Have you seen any other communications by prisoners
3  either through E-mail or through letters which contain the
4  names of staff members in them?
5     A.   It depends on how they send it.  If Joe Blow said
6  the beans won't good, no.
7     Q.   Have you ever seen --
8     A.   Yes.
9     Q.   Okay.  That's all I asked.  And what distinguishes
10  those from the ones that you saw on the E-mails of Mr.
11  Rowe?
12     A.   The ones of Mr. Rowe the way I took it was critical
13  to staff and to the community.
14     Q.   Okay.
15     A.   The other ones they were not critical.  They were,
16  they could talk about how the food was good or whatever, Joe
17  Blow didn't come to work or whatever.  But critical
18  information as far as Mr. Mills and Offender Trane I thought
19  this was very critical to the community.
20     Q.   So your only concern was the criticism of that
21  particular staff person?
22     A.   No, it was more than one staff person.  I don't
23  recall how many more JPays there were, sir.
24     Q.   In that particular JPay, was only one staff person's
25  name?

Page 31

1     A.   I can't remember how many more people was in
2  there.
3     Q.   You also mentioned he was critical of things going
4  on at Sussex 2.
5     MS. MAUGHAN:  Objection to the characterization of
6  that testimony.  It's not that Ms. Carpenter testified that
7  the E-ails were critical of someone, it's that they were
8  critical more in the context of critical importance is to
9  what I understand she testified, given the content and --
10     MR. FOGEL:  And your objection is?
11     MS. MAUGHAN:  To the characterization -- to your
12  characterization of her testimony in asking her about what
13  she found critical.
14     Q.   Did you find anything in those letters that were
15  critical of the institution itself?
16     A.   To the institution itself?
17     Q.   Yes.
18     A.   No, but it was critical to Mr. Mills and Offender
19  Trane's death part, yes, for Mr. Trane's death, because it's
20  not what you hear.
21     MS. MAUGHAN:  Let's clarify critical to and critical
22  of.  What do you mean when you say critical to?
23     A.   It's harm to Mr. Mills and whoever else was inside
24  of that JPay-mail.  I can't recall who else was inside of
25  it.  But the offender's death part that's -- they talk about

Page 32

1  that all day.  I don't see that being critical, but as far as
2  naming staff and what they did and what could have been
3  prevented, that's putting a staff member's life in jeopardy
4  by being out in the community.
5     MS. MAUGHAN:  And when we say critical of someone,
6  we can be critical of that something happened, the beans were
7  bad, the food is not good, that is a criticism.  But in your
8  understanding --
9     A.   It's critical, right.
10     Q.   Did you note anything in those JPay E-mails that
11  were critical of the institution of Sussex 2 Prison?
12     A.   Some of the JPays, correct.
13     Q.   How about the one we're talking about?
14     A.   Correct.
15     Q.   Okay.  Did that add to your concerns?
16     A.   Yes, it did.
17     Q.   How so?
18     A.   Once again because it was critical.
19     Q.   Of the institution?
20     MS. MAUGHAN:  I think again --
21     MR. FOGEL:  No, no, stop.  I know you don't like
22  what she said, but you're going to have to live with it
23  because that's what she said and that's what's the truth.  So
24  you can't just jump in because you didn't like what your
25  client said.

Page 33

1     MS. MAUGHAN:  I think there's a miscommunication
2  between your use of the word critical and hers.
3     MR. FOGEL:  Well, you can do it on redirect, you
4  know that.
5     Q.   Let's try to straighten this out.  Was there
6  anything in that JPay e-mail that you read that concerned you
7  that included information that was critical of Sussex II as
8  an institution, not as to the individuals that you've
9  mentioned?
10     A.   No.
11     Q.   Nothing that was -- was there anything in there that
12  was critical of the institution?
13     A.   Yes.
14     Q.   And that didn't bother you?
15     A.   Yes.
16     Q.   It did bother you?
17     A.   Yes, it did.
18     Q.   Why did it bother you?
19     A.   It bothered me due to the fact that it was naming
20  people.
21     Q.   Why did the criticism of the institution bother
22  you?
23     A.   Because we're here for protection of --
24     Q.   So --
25     A.   We're here for protection of staff and offenders,

UHURU ROWE v. 3:18 HAROLD C. CLARKE
CARPENTER, LT. on 05/31/2019

### Page 34

1   and the stuff bothered me because of the fact that it was
2   naming people that really shouldn't have to go out here and
3   deal with it like that.
4      Q.   It appears you don't want to answer my question, but
5   I will take it that since you don't want to answer it it's
6   because you felt uncomfortable with the answer.
7      A.   Okay.
8      Q.   But you have already told us that you were concerned
9   about Mr. Rowe's criticism of the institution as well as the
10  mention of the two names in that body, in the body of that
11  JPay, correct?
12     A.   Correct.
13     Q.   Okay.  Then did you go to the Warden with that
14  information?
15     A.   I cannot recall when I went to him.
16     Q.   When did you go to security with that information?
17     A.   What do you mean security?
18     Q.   Well, you say that if there was a concern about an
19  outgoing mail or E-mail you would give it to security.  Isn't
20  that what you said?
21     A.   My intel, we are security.
22     Q.   Okay.  There's no separate institution called
23  security?
24     A.   No other security who I give it to.
25     Q.   So when you said security before, if you said it,

### Page 35

1   you meant yourself?
2      A.   Correct.
3      Q.   In the future when you mean yourself could you just
4   say yourself instead of someone that seems like a third party
5   or separate institution?
6      A.   Uh-huh.
7      Q.   You went to the Warden to get permission to review
8   those JPays?
9      A.   Any incoming or outgoing mail.
10     Q.   Right.  And at that juncture you hadn't read any of
11  the mail, just the blogs?
12     A.   Correct.
13     Q.   So you went in and rad the mail, and you found some
14  that you thought were problematic, is that correct?
15     A.   Correct.
16     Q.   What did you do with them?
17     A.   They sent them to censor.
18     Q.   Pardon me?
19     A.   They were sent to security, then they go to
20  censor.
21     Q.   Security is you?
22     A.   No, JPay, you either approve it, you approve it or
23  you send it to security.  Send it to security is a like a web
24  thing that they have on for JPay where they send it to
25  security.

### Page 36

1      Q.   So their security?
2      A.   To their security for JPay.  From Jay we send to
3   security to their censor.
4      Q.   Now I understand.  Security you were referring to
5   refers to the security of the JPay?
6      A.   Correct.
7      Q.   Did you do anything else?
8      A.   No, sir.
9      Q.   Did you confront Mr. Rowe?
10     A.   I believe I did interview Mr. Rowe twice.
11     Q.   How soon after you had censored or arranged to
12  sensor that, how many E-mails do you recall that you
13  censored?
14     A.   I can't recall how many I censored, sir.
15     Q.   And how long after that did you speak to Mr. Rowe?
16  Do you recall approximately?
17     A.   I can't recall.
18     Q.   Okay.  Do you remember recommending Mr. Rowe to be
19  in administrative segregation?
20     A.   No, I did not.
21     Q.   You never did?
22     A.   No, I did not.
23     Q.   Were you aware that he had been in administrative
24  segregation?
25     A.   Yes, I had.

### Page 37

1      Q.   Do you know why?
2      A.   It was due to the Pughsley.
3      Q.   Petition?
4      A.   -- petition, correct.
5      Q.   What about it?
6      A.   What do you mean what about it?
7      Q.   You said it was due to the petition.  What aspect of
8   the petition led to hi being put in --
9      A.   The information that we received that Pughsley and
10  Mr. Rowe was going around with a petition trying to have
11  other offenders sign it.  They were sent over to Sussex 1 to
12  confinement, which is RHU, until further investigation was
13  conducted.
14     Q.   Were you involved in that at all?
15     A.   Involved in?
16     Q.   In investigation, in the prosecution, any of that?
17     A.   Yes, I was.
18     Q.   What was your role?
19     A.   Once we gained the information and got the
20  information from Offender Pughsley and we searched Mr. Rowe's
21  property, I don't recall getting anything out of Mr. Rowe's
22  property.  When I went over there and explained to him that
23  he would being coming back to Sussex II, then he was not
24  institutional charged if I'm not -- I don't think he was
25  institutional charged.

UHURU ROWE v. 3:18 HAROLD C. CLARKE
CARPENTER, LT. on 05/31/2019

Page 38

1   Q.   And that was all your involvement?

2   A.   Yes.

3   Q.   Okay.  You were sitting here through Mr. Rowe's

4   testimony.  I assume you were listening, correct?

5   A.   Yes.

6   Q.   You heard Mr. Rowe testify there were instances

7   where it appeared that his E-mails had been delayed for

8   several weeks?

9   A.   Correct.

10   Q.   Are you aware of any such E-mails being delayed?

11   A.   Yes, I have.

12   Q.   Okay.

13   A.   We don't -- we try to read them every day.

14   Sometimes we don't get a chance to read them every day.  So

15   the ones that we do have mail cover on and to go back to do

16   once we have a chance we try to get them sent out as soon as

17   possible within 24 to 72 hours.  Sometimes our schedule gets

18   thrown back dealing with another problem in the institution.

19   As soon as we get to them we try to send them straight out.

20   Q.   So there will been instances in which a JPay e-mail

21   was sent out, you have printed it out but haven't acted on it

22   yet, correct?

23   A.   No.

24   Q.   Because you haven't had a chance to read it?

25   A.   No, it would not just sit there until we actually

Page 39

1   open it up and approve it to be sent or sent to security.

2   Q.   Okay.  And that would be the explanation at least

3   for some delays at some times?

4   A.   Correct.

5   Q.   When you looked at the E-mails that you censored, or

6   you understand what I mean you censored, did you converse

7   with anybody about whether they should be censored?

8   A.   We spoke with Ms. Brickhead, which was the

9   operations manager, and that's why they were sent to

10   censored.

11   Q.   Because Ms. Brickhead said to do so?

12   A.   She was the operational manager and she's over Top

13   of the mail room that's like outgoing mail, and she advised

14   advised of the information and everything and she was like

15   they cannot go out.  So she gave us permission not to send

16   that JPay E-mail out.

17   Q.   You don't have the authority on your own?

18   A.   Do I have the authority?  I have a boss too, but

19   that's who I follow up.  If I feel like they need to go, then

20   I'll tell them what I have and they'll give me permission to

21   send it or not send it.

22   Q.   They being?

23   A.   Ms. Brickhead and above.

24   Q.   Okay.  Let's talk about Mr. Rowe.  When you looked

25   at it you thought there was a concern because he mentioned

Page 40

1   the names of a staff member in connection with the death of

2   somebody?

3   A.   I sent it to security.

4   Q.   All right.  And then did you speak to Ms. Brickhead

5   about it?

6   A.   Yes, I printed it out.

7   Q.   Before you sent it to security, right?

8   A.   I put -- I sent it to security so I can go back into

9   it.  It would never go no where as long as I had it there.

10   Q.   And you can retrieve it back from security?

11   A.   I can go back and retrieve it from security.  So

12   once I go there and sent to security, I pulled it back and

13   sent it to Brickhead and printed off and let her know what I

14   have.  And she was like she would give me permission to

15   either send it or send it to censor.

16   Q.   And she did in this instance?

17   A.   Correct.

18   Q.   Did she share with you what her concerns were about

19   the JPay that you brought to her?

20   A.   No, she started off with my intel officer when they

21   first started off with the JPays, and she instructed them to

22   send the ones like that straight to --

23   Q.   Security?

24   A.   -- security, yeah, it goes to security, then it go

25   up to censor.

Page 41

1   Q.   Now, you have read lots of Mr. Rowe's E-mails I take

2   it?

3   A.   Yes.

4   Q.   Did you ever see another E-mail where he mentioned

5   the name of a staff member?

6   A.   Yes.

7   Q.   And did you censor every one of those?

8   A.   I can't recall if I did or if I didn't.

9   Q.   You might not have?

10   A.   I might have, but I can't recall if I did, if I

11   didn't.

12   Q.   So you might not have?

13   A.   I might not have, but I can't recall.

14   Q.   Can you tell me the circumstances where you wouldn't

15   censor it even though it had the name of a staff member in

16   it?

17   A.   I wouldn't sensor it if he just saying something

18   general about a staff member.  But something critical I would

19   send to security until further notice.

20   Q.   Can you explain what you mean by critical?

21   A.   Critical would be harm's way, assaulted, threats,

22   anything like that I would send it to security.  Anything

23   else I would just send it to -- I print it off and just sent

24   it off.

25   Q.   There were no threats in this E-mail, were there?

UHURU ROWE v. 3:18 HAROLD C. CLARKE
CARPENTER, LT. on 05/31/2019

---

**Page 42**

1    A.   In what E-mail?

2    Q.   The one we're talking about, the one that you
3    censored.  The first one you censored.

4         MS. MAUGHAN:  If you're going to ask about a
5    specific E-mail we need to see the specific E-mail.

6    A.   I can't recall.

7         MR. FOGEL:  That was marked as part of D1.  Do we
8    have D1 here?

9         MS. MAUGHAN:  D1 was the complaint with the
10   attachments.

11        You have got the complaint right in front of you.

12   Q.   I'm going to show you what's attached to Defendant's
13   Exhibit 1, which is the Complaint.  And it says on here A,
14   but that's not for this purpose.  Is that familiar to you?

15   A.   Yes.

16   Q.   And is that one of the E-mails that you had
17   censored?

18   A.   I can't say if I censored it or not.

19   Q.   Do you know what was censored?  Do you know what you
20   censored?

21   A.   I can't say if I censored it or not, because someone
22   in my intel department could have censored it.  I don't know
23   which ones I have read, but I have seen it before.

24   Q.   How would you know who did it?

25   A.   It would tell you.

---

**Page 43**

1    Q.   What would tell you?

2    A.   I would have to go back and pull it up as to
3    actually who read it, but I have seen this before.

4    Q.   And you're saying you don't know whether or not you
5    censored it or not?

6         MS. MAUGHAN:  I'm going to object to the extent
7    you're talking about Exhibit A to Plaintiff's Complaint,
8    which is not an E-mail.  SO we're talking about censoring
9    E-mails, that's difference than this A, so I think it needs
10   to be clarified what we're talking about.

11   Q.   It's already been gone through.  But can you
12   identify the document you have in front of you?

13   A.   Yes, it's a letter.

14   Q.   You have seen it before?

15   A.   Handwritten.

16   Q.   You have seen it before?

17   A.   Yes, it went out through the mail.

18   Q.   Through the?

19   A.   Regular mail, U.S. Postal mail.

20   Q.   And did you review it before it went out?

21   A.   Yes, I did.

22   Q.   And you let it go out?

23   A.   Yes, I did.

24   Q.   Had you seen it before that?

25   A.   No.

---

**Page 44**

1    Q.   You had never seen it before that?

2    A.   No.

3    Q.   So you don't know, as far as you know this had never
4    been censored, the content of the document that you have in
5    front of you?

6    A.   I don't know if it's been censored or not, but I saw
7    the letter.

8    Q.   But if you knew it had been censored you wouldn't
9    allow this letter to go out, would you?

10   A.   Not me, no, sir.

11   Q.   But you allowed this letter to go out?

12   A.   Correct.

13   Q.   So you didn't have any idea that it was censored?

14   A.   Correct.

15   Q.   And you don't know as you sit here now who, if
16   anyone, would have censored it?

17   A.   No.

18   Q.   But there is a way to find out?

19   A.   Yes.

20   Q.   Is it a marking on the security system that marks
21   who entered the request?

22   A.   Yes.

23   Q.   Okay.  So you said you were concerned about the
24   names that were in this document, a document?

25   A.   Correct.

---

**Page 45**

1    Q.   Was this the document that you were concerned about
2    the names?

3    A.   No.

4    Q.   Sorry?

5    A.   No, sir.

6    Q.   No?

7    A.   There was no names included in this document.

8    Q.   Let me show you another document and ask you if you
9    have seen that before.

10   A.   Yes.

11   Q.   Have you seen it before?

12   A.   Yes.

13   Q.   Can you recall when and where?

14   A.   On JPay if I'm not mistaken.

15   Q.   And you read it at that time?

16   A.   I can't say if I read it or not.

17   Q.   Do you know whether or not this document was
18   censored?

19   A.   Do I know if it was censored or not?

20   Q.   Yes.

21   A.   I can't recall.

22   Q.   But there is a way to find out?

23   A.   Yes.

24   Q.   And I assume since you can't recall, you wouldn't
25   know whether it was you or somebody else?

---

UHURU ROWE v. 3:18 HAROLD C. CLARKE
CARPENTER, LT. on 05/31/2019

Page 46

1   A.   Correct.

2   Q.   So we have the same issue on both of them.  Okay.

3        Now just very quickly, you don't have the authority

4   on your own to censor mail, do you?

5   A.   No, I do not.

6   Q.   Just JPays, only with the cover letter from the

7   Warden?

8   A.   Correct.

9   Q.   Now, does it get back to the Warden the specific

10  items that you've censored?  If you censor something, you

11  have had permission from the Warden to censor anything,

12  you've told us that you often go talk to Ms. Brickhead about

13  whether to censor it?

14  A.   Uh-huh.

15  Q.   Or is that always?

16  A.   No, it depends on the type incident that we're

17  dealing with, and she will advise us if we can censor it or

18  send it on.

19  Q.   And this instance with Ms. Rowe you spoke with Ms.

20  Brickhead?

21  A.   Correct.

22  Q.   And she was the one who could authorize that

23  censorship at that time?

24  A.   Correct.

25  Q.   Not you?

Page 47

1   A.   Correct.

2   Q.   Now, when an appeal is taken from a decision, for

3   example to censor something, who does it go to first?

4   Informally it would go to you, wouldn't it?

5   A.   Say that again.

6   Q.   The informal complaint would come to you about

7   Censorship of a JPay e-mail?

8   A.   Yes.

9   Q.   And it would be your responsibility to respond?

10  A.   Correct.

11  Q.   And an appeal from that decision was -- well, not a

12  decision, you're simply responding to the informal

13  complaint?

14  A.   Correct.

15  Q.   And then do you understand the grievance

16  procedure?

17  A.   Yes.

18  Q.   And then the prisoner if they want to they can file

19  a regular grievance?

20  A.   Correct.

21  Q.   And that doesn't go to you?

22  A.   Correct.

23  Q.   That goes to the intake officer?

24  A.   Yes.

25  Q.   And eventually it goes to the Warden?

Page 48

1   A.   Correct.

2   Q.   And only the Warden can get the final word, at least

3   at the institutional level.  Is that correct?

4   A.   (Nods head yes).

5   Q.   Is that yes?

6   A.   Correct.

7   Q.   Now, in response to at least one of the essays that

8   Mr. Rowe claims was censored, you -- well, this is at

9   Defendant's 3.  You said inspection, I'm sorry, I shouldn't

10  say you said.  Do you see the signature there on the left  on

11  the bottom?

12  A.   Yes.

13  Q.   That is your signature?

14  A.   Correct.

15  Q.   Would You read that to us?

16  A.   "Inspection of offender correspondence according to

17  operation procedures 803.1 correspondence is read, censored

18  or rejected based on facility interest of order and

19  security".

20  Q.   You didn't explain to him that it had to do with him

21  naming people in a situation where they could be at risk?

22  A.   No, I did not.

23  Q.   But that would have informed him for the future,

24  wouldn't it have?

25  A.   I mean the contents, he would receive something from

Page 49

1   JPay saying it was censored.  So that's telling him it was

2   violation of policy and procedure when he received the

3   notification back.

4   Q.   But he'll never find out what policy or procedure it

5   was if you don't tell him?

6   A.   I told him on correspondence 803.1.

7   Q.   How many pages is 803.1?  Can you count them?

8   A.   21.

9   Q.   Okay.  And are they single lines?  They're not

10  double spaced, they're single lines and they're both sides of

11  the page, aren't they?

12  A.   Yes, sir.

13  Q.   So it's a very simple matter to just do that?

14  MS. MAUGHAN:  Objection to form.

15  Q.   To know that this is -- that the reason is why

16  you're rejecting that correspondence?

17  MS. MAUGHAN:  Objection to form.  That's not a

18  question.

19  Q.   Are you obligated to tell prisoners why you're

20  rejecting their correspondence?

21  A.   Once their correspondence is rejected it goes back

22  to the JPay and informs them why it was rejected.  They have

23  a dropdown list of violation policies and procedures, and

24  it's sent back to their JPay.

25  MR. FOGEL:  Could you read back the question,

UHURU ROWE v. 3:18 HAROLD C. CLARKE
CARPENTER, LT. on 05/31/2019

Page 50

```
1    please?
2              THE COURT REPORTER: . "Are you obligated to tell
3    prisoners why you're rejecting their correspondence?"
4    A.   Yes.
5    Q.   And in your opinion it suffices to say look at this
6    21 page document, you'll find it there somewhere?  Does' that
7    fulfill your obligation?
8    A.   Yes, sir.
9    Q.   It does?  Okay.  And that's what you always wrote
10   when you responded?
11   A.   Correct.
12   Q.   That it was somehow a violation of something in OP
13   803.1, correct?
14   A.   Correct.
15   Q.   Did you know what it was a violation of in 803.1?
16   A.   Policies and procedure.
17   Q.   What in particular?  If you look at 21 pages.
18   A.   So do you want me to tell the page number?
19   Q.   I want to know the provision.  I don't care about
20   the page number.  What provision is it that you're relying to
21   say everything was done based on that procedure?
22             MS. MAUGHAN:  I'm going to object to relevance of
23   this line of inquiry.  You can answer if you know.
24   A.   It's on page 12 of 21, sir.
25   Q.   And the section is the one that's highlighted?
```

Page 51

```
1    A.   Yes, sir.
2    Q.   And It says "Outgoing mail should not generally be
3    searched unless there is a reason for suspicion", is that
4    correct?
5    A.   Correct.
6    Q.   And your reason for suspicion was that Mr. Rowe had
7    a blog?
8    A.   Correct.
9    Q.   And that was it?
10   A.   No, sir, and the JPays that was being sent out.
11   Q.   But you didn't see the JPays?
12   A.   Correct.
13   Q.   So your suspicion in order to look at the JPays was
14   that he had a blog?
15   A.   Correct.
16   Q.   And that was it?
17   A.   Correct.
18   Q.   That's the circumstances is having a blog?
19   A.   Blog.
20   Q.   Is having a blog is suspicious?
21   A.   No, the blog is not suspicious, but he's doing a
22   blog on the internet.  He has to be sending it through the
23   mail some type way through JPay.  So I have to have
24   permission to check his mail before it's being sent out.
25             How is he going to send the blog out?
```

Page 52

```
1    Q.   Just very quickly, you may not search unless there's
2    a reason for suspicion?
3    A.   Correct.
4    Q.   Your reason for suspicion in this particular
5    instance with Mr. Rowe was that your knowledge that he had a
6    blog?
7    A.   Correct.
8    Q.   And that was all you knew?
9    A.   At the time.
10   Q.   That led you to suspect that what he was sending out
11   on JPay would somehow violate 803.1?
12   A.   Correct.
13   Q.   I have no further questions.
14
15   BY MS. MAUGHAN:
16
17   Q.   Ms. Carpenter, I believe you testified that you
18   first became aware of Mr. Rowe's existence in March or
19   February 2018.  Does that sound right?
20   A.   Correct.
21   Q.   And explain to me again what your testimony was
22   about how you came to be aware of Mr. Rowe.
23   A.   Ms. Ryan, she came to my intel officer and explained
24   to my intel officer that Mr. Rowe had a blog page going on
25   and it was very interesting, for her to check it out.  So she
```

Page 53

```
1    went on the blog page, she looked at it.  When she advised me
2    of what she had read, I told her to get in contact with Ms.
3    Brickhead the operational manager and to find out where we
4    need to start it from here.  And that's when she gave us the
5    instructions on where we can begin with doing the mail cover
6    and getting it signed.
7    Q.   And you mentioned that there was a petition and
8    something about riots.  Tell me more about that.
9    A.   We had a petition going around for to set a riot to
10   offenders going on a hunger strike, not to go to the dining
11   hall.  At the time that this petition was going around we
12   couldn't tell if it is --
13   (Court reporter asks witness to slow down)
14   A.   At the time this petition was going around we said
15   had to take it into consider safety for offenders and staff
16   being hurt, so that's when we stepped in.  And that's when we
17   learned about the riot and the petition.
18   Q.   Did you learn about the riot and the petition before
19   you learned about Mr. Rowe's blog or after?
20   A.   After if I can recall.
21   Q.   Okay.  What was concerning to you about the petition
22   and the riots?  What did you guys know?  What were you
23   thinking about?
24   A.   We was thinking about offender safety and
25   everything, people not getting hurt, staff not getting
```

**Page 54**

1   hurt.

2       Q.   So at the time you learned about the petition and

3   the possibility of a riot, were you concerned that there

4   would be a riot?

5       A.   I couldn't say it was going to be a riot or not, we

6   were just taking the precautions.

7       Q.   How did you learn about the issue with the riot?

8       A.   By an informant.

9       Q.   And was that informant an offender?

10      A.   Yes.

11      Q.   And what did that offender inform you?

12      A.   He informed me that there was going to be a riot and

13   that they was going to do a hunger strike and to go to dining

14   hall, and he was afraid that staff and offenders were going

15   to end up getting hurt.

16      Q.   So he was telling you, he was reporting this in

17   order to stop the riot?

18      A.   Correct.

19      Q.   Was that around the same time that you guys found

20   out about the petition that we've talked about?

21      A.   Yes, ma'am.

22      Q.   Did you believe there might have been a relationship

23   between the petition and the potential riot?

24      A.   Yes.

25      Q.   Why did you think that?

**Page 55**

1       A.   The petition was going around at the same time that

2   the riot, the reason why I think, is what you said?  Can you

3   repeat that.

4           MS. MAUGHAN:  I've forgotten my question.  Could you

5   read it?

6           COURT REPORTER:  "Did you believe there might have

7   been a relationship between the petition and the potential

8   riot?"

9       A.   Because offenders had signed the petition, the

10   petition was found with offenders signature and a state

11   number beside it.

12      Q.   And a state number was beside it?

13      A.   Yes, ma'am.

14      Q.   Okay.  And those things were happening around the

15   same time, is that correct?

16      A.   Yes, ma'am.

17      Q.   And Mr. Rowe signed that petition?

18      A.   Yes, ma'am.

19      Q.   With 40 or 45 other people?

20      A.   Correct.

21      Q.   And those people being offenders?

22      A.   Yes, ma'am.

23      Q.   Did your knowledge about the possible riot and the

24   petition inform at all your decision or the decision to delay

25   or review Mr. Rowe's E-mails?  That was a bad question.  I'm

**Page 56**

1   sorry.  My brain is getting tired.

2           Did your knowledge about the petition and your

3   concern about a riot go into the decision to stop any of

4   Mr. Rowe's E-mails from going out?

5       A.   No.

6       Q.   It did not?

7       A.   Say that again.

8       Q.   I'm sorry, maybe that was another bad question.

9           Did your knowledge of the petition and the riot at

10   all affect your decision to stop Mr. Rowe's E-mails that went

11   out?  Sorry, That's also a bad question.

12           That's not what you testified to.

13           At the time Mr. Rowe's E-mails were being censored,

14   did staff at the prison know about the riot and the petition

15   that were going around?

16      A.   Yes.

17      Q.   To the best of your knowledge, understanding that

18   you may not have been the person who censored these e-mails,

19   to the best of your knowledge did the knowledge about the

20   riot and the petition have an impact on the decision to stop

21   Mr. Rowe's E-mails?

22      A.   Yes.

23      Q.   Okay.  There was also a little bit of confusion I

24   think about the use of the words critical and critical to

25   in your testimony that you gave earlier.  You testified about

**Page 57**

1   things that you found critical, and you said critical to -- I

2   believe you were using the phrase critical to the

3   institution.  What do you mean by the phrase critical to?

4       A.   Harm, threats, danger to.

5       Q.   So would it be fair to say that when you're thinking

6   that something might be critical to someone that is possibly

7   putting them in danger?

8       A.   Yes.

9       Q.   Okay.  If I say that I am critical of someone, does

10   that have a different meaning to you?

11      A.   Yes.

12      Q.   Okay.  So if I say that I'm critical of trying not

13   to be political, if I'm critical of the President, of a

14   country that doesn't exactly exist, what does that mean to

15   you?

16      A.   Just critical of it, that you're just speaking

17   terms.  It's not that you're making a threat toward it,

18   you're not putting it like in harm's way.  You're not making

19   a threat directly towards something.

20      Q.   So if I say I don't like the president of this other

21   country?

22      A.   You're just making a statement.

23      Q.   So I'm being critical of that president?

24      A.   Correct.

25      Q.   And so there's a difference to you between being

UHURU ROWE v. 3:18 HAROLD C. CLARKE
CARPENTER, LT. on 05/31/2019

**Page 58**

1   critical of something and critical to?

2       A.   Correct.

3       Q.   So in thinking about Mr. Rowe's e-mails that were

4   stopped or his JPay messages, were those messages concerning

5   to you because they were critical to a person at the

6   facility?

7       A.   Yes.

8       Q.   Did you also think that his E-mails were critical of

9   the facility?

10      A.   Yes.

11      Q.   So can you give me an example of something that you

12  recall Mr. Rowe complaining about in his e-mails that was

13  critical of the facility?

14      A.   When he talk about what medical, the water, food,

15  commissary.

16      Q.   Okay.

17      A.   Just etc., things like that.

18      Q.   Do offenders frequently say things or write things

19  that are critical of the facility where they're housed?

20      A.   Yes.

21      Q.   Is that a security concern to you?

22      A.   Not as major as critical to.

23      Q.   Okay.  So let's move on to what might be critical to

24  in this situation.  You mentioned an offender named Johnny

25  Trane, is that correct?

**Page 59**

1       A.   Correct.

2       Q.   And Mr. Trane recently died?

3       A.   Correct.

4       Q.   Based upon your recollection of Mr. Rowe's E-mail

5   about Mr. Trane, what was he saying about Mr. Trane?

6       A.   He's saying Mr. Mills' -- his death could have been

7   prevented due to unit manager Mr. Mills.  That too is

8   bringing Mr. Mills like he could have prevented death from

9   happening or it shouldn't have happened.  If that blog had

10  got out or it got out, it could have put Mr. Mills' life in

11  danger.  He was being critical, put into danger by he's

12  saying that Trane's death could have been prevented due to

13  Mr. Mills.

14      Q.   And so was your concern that Mr. Trane's family

15  might read think it was true and somebody might try to hurt

16  Mr. Mills?

17      A.   Yes, ma'am.

18      Q.   So that's what you mean by critical to?

19      A.   Yes, ma'am.

20      Q.   And so being fair, that's also critical of

21  Mr. Mills, right?

22      A.   Correct.

23      Q.   You're familiar with OP 803.1, correct?

24           Do offenders have access to 803.1?

25      A.   Yes.

**Page 60**

1           MS. MAUGHAN:  Mr. Fogel, do you have a copy of 803.1

2   floating around somewhere?

3       Q.   Okay, I have a couple of question for your about

4   803.1, and we only have one copy and we can look at it both

5   at the same time.  So in looking at OP 803.1 and looking at

6   page 19 of 20 on the document Mr. Fogel has provided, and

7   this document as an effective date of October 1, 2017 and it

8   says it was amended effective 4-1-18.

9           So in section Roman numeral eight, it's entitled

10  "Secure Messaging".  Did I read that correctly?

11      A.   Yes.

12      Q.   Okay.  And this part of secure, this secure

13  messaging section of 803.1 is a separate section from the

14  section that talks about offender postal mail, correct?

15      A.   Correct.

16      Q.   Are JPay messages treated differently than offender

17  Postal mail?

18      A.   No.

19      Q.   And it says, looking now at page 20 of that same

20  operating procedure Section E, can you read what Section E

21  says for me, please?

22      A.   "All incoming outgoing messages will be screened and

23  must comply with the regulations governing written

24  correspondence as provided in the operation procedure".

25      Q.   When it says "all incoming and outgoing messages

**Page 61**

1   will be screened," what does that mean?

2       A.   All offenders E-mail, JPay E-mails are screened,

3   incoming and outgoing.

4       Q.   What does it mean to screen them?

5       A.   You select, so I mean instead of just trying to do

6   everybody, you just do it selectively and just go through.

7   If you have a target or you're looking at someone then you're

8   definitely going to read their JPay E-mails.  So you just

9   screen through all, I mean through the JPay e-mails, and if

10  they're approved to go out then they get approved and they've

11  been sent out.

12      Q.   Under this particular provision of this OP, you have

13  a mail cover or letter that you were talking about

14  earlier to screen JPay e-mails?

15      A.   No, for the outgoing mail for the regular United

16  States Postal Mail I have that from the United States Postal

17  Mail.

18      Q.   So is it your practice to get a mail cover letter

19  even if you're going to screen JPay messages also?

20      A.   No, I does it for my regular mail.

21      Q.   Okay, but you don't --

22      A.   No, because Jpay if all of them just come straight

23  up on the screen.

24      Q.   So the policy does not require you to get a mail

25  cover letter for the JPay mail messages?

UHURU ROWE v. 3:18 HAROLD C. CLARKE
CARPENTER, LT. on 05/31/2019

Page 62

1   A.   No.
2   Q.   I don't think I have any other questions right now.
3        MR. FOGEL:  I have got a few.
4
5   BY MR. FOGEL:
6
7   Q.   Lieutenant, did you just say that you're authorized
8   to look at any JPay messages sent out of the institution
9   without any permission from anybody?
10  A.   Correct, but they're screening, you're screening,
11  that's not that you're looking at every last one of them.  If
12  I have information that okay, Rowe, I need to put a mail
13  cover on him because I'm receiving information that this is
14  going on with him.  I'm going to do a mail cover on him
15  regardless to cover me for his incoming, outgoing and his
16  JPay.  Because I haven't been reading Rowe's JPays because he
17  never gave me a problem.  But I have ones that I'm dealing
18  with that I have to check on this guy here, so sure I put a
19  mail cover on him for his incoming, outgoing, and that will
20  cover his JPays also.
21  Q.   Why do you need a mail cover for the JPays?
22  A.   For me that's what I does that.
23  Q.   So you're not making the decision about censorship,
24  it's the Warden?
25  A.   What do you mean making the decision for what?

Page 63

1   Q.   You said to cover yourself, to protect yourself from
2   what?
3   A.   For JPay?  If I have -- like I said, if I am working
4   a case on him, I'm going to do a mail cover so when it comes
5   back and says did you have a mail cover, I have proof that I
6   have a mail cover for checking your incoming and outgoing
7   mail.  That's considered to me is incoming and outgoing
8   mail.
9   Q.   But you don't need a cover in order to --
10  A.   That's incoming and outgoing mail.
11  Q.   So you do need a cover?
12  A.   Not really for JPays because I'm not screening every
13  one.
14  Q.   Are you authorized to screen anybody's JPay --
15  A.   Yes, I am authorized.
16  Q.   -- E-mails without specific permission?
17  A.   Yes.
18  Q.   Okay.  And therefore you could do everyone's E-mail
19  without permission, correct?
20  A.   Correct.
21  Q.   Why do you get cover letters?
22  A.   Because incoming outgoing mail, if I'm going to be
23  opening up an investigation is going to ask me did I have
24  permission for the incoming and outgoing mail, which is going
25  to be outgoing mail that I need to get from the mail room and

Page 64

1   the incoming mail that's coming in from the mail room.
2   Q.   And the JPays?
3   A.   I don't have to have anything because it's coming
4   from JPay.  They're sending it through to us.
5   Q.   So you can read any JPay e-mail?
6   A.   Correct.
7   Q.   Without getting a cover letter?
8   A.   Correct.
9   Q.   From anybody?
10  A.   Correct.
11  Q.   But in many instances you do get cover letters?
12  A.   Correct.
13  Q.   That gives you protection?
14  A.   Correct.
15  Q.   And in this particular instance that we're talking
16  about here, you didn't get a cover letter, you first went to
17  Ms. Brickhead and she authorize you to do it?
18  A.   Yes.
19  Q.   But you didn't need her authorization, did you?
20  A.   No.
21  Q.   But you did it why?
22  A.   We just started off really doing JPays and started
23  screening everybody because I was by myself at the time, and
24  I was just doing selected ones that was coming up that I was
25  actually doing investigation on.

Page 65

1   Q.   Why did you do to Ms. Brickhead if you didn't need
2   authority?
3   A.   Because of the incident that occurred, the blog.
4   She was over top of the mail room.  She was a supervisor for
5   the mail room, incoming and outgoing mail, so that's why my
6   intel officer went to her.
7   Q.   But you didn't know go to her --
8   A.   My intel officer did not know that, that's why she
9   went to her to advise her what was going on.
10  Q.   But you didn't need to go to her in order to read
11  the JPays?
12  A.   No.
13  Q.   So she went to her anyway.  And can you explain why,
14  if you know?
15  A.   No, I do not know why she went there.
16  Q.   And but you have regularly gone and spoken to her
17  and asked her opinion about censorship, have you not?
18  A.   Asked who?
19  Q.   Ms. Brickhead.  You asked her opinion other than
20  with Mr. Rowe about whether or not an item should be
21  censored?
22  A.   She just instructed my intel that if anything comes
23  up with this blog or a petition -- I mean not the petition
24  thing, with the blog, you know, to censor all of them.  So
25  that's when they sensor and goes to security.

UHURU ROWE v. 3:18 HAROLD C. CLARKE
CARPENTER, LT. on 05/31/2019

**Page 66**

1  Q.  My question is have you, since Mr. Rowe's E-mail was
2  censored, ever gone to Ms. Brickhead to ask her advice about
3  whether to sensor something?
4  A.  Yes.
5  Q.  Regularly?
6  A.  Yes.
7  Q.  Okay, that's my question.
8      Now, you say in response to questions from your
9  lawyer that the rumor you heard from a snitch?
10  A.  It's not a snitch, it's an informant.
11  Q.  What's the difference?
12  A.  We don't call them snitches, we call them
13  informants.
14  Q.  What's the difference?
15  A.  It's a difference for me.  I call them informants --
16  Q.  You can call them anything You want and I can call
17  them anything I want.  You understand what I'm saying when I
18  say snitch?
19  A.  Yes.
20  Q.  For your benefit, you had an informant who came and
21  told you that there was what, talk of a riot?
22  A.  Correct.
23  Q.  What, if any, connection did you make to Mr. Rowe
24  about that?
25  A.  What connection did I make to Mr. Rowe?

**Page 67**

1  Q.  Yes, about the so called riot.
2  A.  I didn't make any connection to him until the
3  petition stuff came up.
4  Q.  And then you made the same connection that you made
5  with the 40 or so other people who also signed it?
6  A.  Correct.
7  Q.  Whose blogs -- you didn't look to see whether they
8  had blogs, did you?
9  A.  No, I did not.
10  Q.  And you didn't look at their JPays, did you?
11  A.  Yes, I did.
12  Q.  You did look at all 40?
13  A.  Yes, I did.
14  Q.  Now, at any point were you told -- by the way, who's
15  Ms. Darden?
16  A.  I don't know who Ms. Darden is.
17  Q.  Wasn't she the Warden at some point?
18  A.  No, sir.
19  Q.  At Sussex?  Was she an assistant warden?
20  A.  No, sir.
21  Q.  Okay.  Who is Mr. Holloway?  Do you know him?
22  A.  Yes, I do.
23  Q.  He is the --
24  A.  Regional.
25  Q.  Regional administrator?

**Page 68**

1  A.  Yes, sir.
2  Q.  And he goes through the Warden's decisions and
3  grievances?
4  A.  Correct.
5  Q.  And he has authority to either uphold them?
6  A.  Correct.
7  Q.  Or to reverse them?
8  A.  Correct.
9  Q.  And same thing with headquarters, there's a further
10  appeal in some instances?
11  A.  Yes.
12  Q.  And they have the authority to either uphold it,
13  or --
14  A.  Yes, sir.
15  Q.  -- or to reject it?  Okay.
16      Did you ever talk to the Warden about Mr. Rowe other
17  than that one time you mentioned?
18  A.  No.
19  Q.  Were you ever told any advice about whether you
20  should continue to censor his material or not?
21  A.  No.
22  Q.  You weren't told to stop?
23  A.  No.
24  Q.  So in subsequent times after these two incidents of
25  censorship, you didn't find any other JPays that raised a

**Page 69**

1  concern for you?
2  A.  Ms. Brickhead contacted my intel officer and told
3  her. I don't know what they discussed, so I can't answer
4  that question, but for me, no.
5  Q.  And you don't know what they discussed?
6  A.  No.
7  Q.  What's the name of that intel officer?
8  A.  Perkerson.  P-e-r-k-e-r-s-o-n.
9  Q.  And first name?
10  A.  N as is Nancy.
11  Q.  I have no further questions.
12      MS. MAUGHAN:  I don't have anything either.
13      (Deposition concluded at 2:40 p.m.)
14  AND FURTHER THIS DEPONENT SAITH NOT
15
16
17
18
19
20
21
22
23
24
25

UHURU ROWE v. 3:18 HAROLD C. CLARKE
CARPENTER, LT. on 05/31/2019

Page 70

```
 1   COMMONWEALTH OF VIRGINIA AT LARGE, to wit:
 2        I, Cynthia G. Shortlidge, notary public in and for the
 3   Commonwealth of Virginia at large, and whose commission
 4   expires August 31, 2019, do certify that the aforementioned
 5   appeared before me and that the foregoing is a true, correct
 6   and full transcript of the hearing.
 7        I further certify that I am  neither related to nor
 8   associated with any counsel or party to this proceeding, nor
 9   otherwise interested in the event thereof.
10
11        Given under my hand this 11th day of June, 2019, at
12   Richmond, Virginia.
                         UHURU ROWE v. 3:18 HAROLD C. CLARKE
13                       CARPENTER, LT. on 05/31/2019
14
15        _____
16                   Cynthia G. Shortlidge, Notary Public
17                   Notary Registration Number 198638
18
19
20
21
22
23
24
25
```

Page 71

```
 1        CHANGES REQUESTED TO THE DEPOSITION OF
 2        LT. MICHELLE CARPENTER, TAKEN ON MAY 31, 2019
 3     Page/Line:     Change to/from:          Reason:
 4   ==============================================================
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
                      Halasz Reporting & Video | 804.708.0025
14   _____ PO Box 1644  Richmond, VA 23218-1644
15   _____
16   _____
17   _____
18
19              _____
                       Lt. Michelle Carpenter
20   Commonwealth of Virginia, to wit:
21        Subscribed to before me
22   this _____ day of _____, 2019.
23   _____
24              Notary Public
25              My Commission expires:      /    /
```

UHURU ROWE v. 3:18 HAROLD C. CLARKE
CARPENTER, LT. on 05/31/2019

Index: 1..breath

**1**

1 37:11 42:13 60:7
12 50:24
19 60:6

**2**

2 9:20 11:1 21:25 31:4 32:11
20 60:6,19
2017 60:7
2018 6:14 8:1 52:19
21 49:8 50:6,17,24
24 38:17
2:40 69:13

**3**

3 48:9
300 8:15

**4**

4-1-18 60:8
40 8:16,24 9:2,15 55:19 67:5,12
45 8:16 55:19

**5**

5 10:16

**7**

72 38:17

**8**

803.1 15:11 17:3 48:17 49:6,7 50:13,
  15 52:11 59:23,24 60:1,4,5,13

**A**

access 9:19 10:6,11,14 13:8,9 15:7
  27:9,14 59:24

acted 38:21
add 32:15
address 13:10
administrative 36:19,23
administrator 67:25
admitted 8:7
advice 66:2 68:19
advise 46:17 65:9
advised 39:14 53:1
affect 56:10
afraid 54:14
allowed 9:19,22,24 13:21 15:23 16:1
  44:11
Allowing 22:23
amended 60:8
answers 24:22
anybody's 63:14
appeal 47:2,11 68:10
appeared 38:7
appears 34:4
approve 35:22 39:1
approved 18:8 61:10
approving 18:11,12
approximately 8:24 9:15 26:20
  36:16
armed 19:1 22:25
arranged 36:11
art 11:10,11
arts 10:25
asks 16:7 18:19 53:13
aspect 37:7
assault 21:16
assaulted 41:21
assistant 67:19
attached 42:12
attachments 42:10

attention 6:17 9:17 10:23 13:20 14:2,
  11
authority 39:17,18 46:3 65:2 68:5,12
authorization 64:19
authorize 46:22 64:17
authorized 62:7 63:14,15
authorizes 24:7
authorizing 23:18
aware 6:12 7:25 8:17 10:20,22 24:11,
  12 36:23 38:10 52:18,22

**B**

back 16:15 37:23 38:15,18 40:8,10,
  11,12 43:2 46:9 49:3,21,24,25 63:5
bad 32:7 55:25 56:8,11
based 48:18 50:21 59:4
basis 14:24,25
beans 30:6 32:6
begin 53:5
believed 11:7
benefit 66:20
bit 24:23,24 25:1 56:23
blog 9:17 11:4,7,12,13,20 13:3,6,8,25
  14:1,5,7,11 19:21,24 20:5,7,8,9,10,18,
  19,23 21:2,4,6,13,17 22:1,7,15,17
  23:1 24:18,19 25:4,7,8,9,11,12,14,16,
  22 26:9 51:7,14,18,19,20,21,22,25
  52:6,24 53:1,19 59:9 65:3,23,24
blogs 6:18 9:16 10:20 11:22,25 14:12
  21:22 35:11 67:7,8
Blow 30:5,17
body 34:10
boss 39:18
bother 33:14,16,18,21
bothered 33:19 34:1
bottom 48:11
bought 10:17
box 18:23
brain 56:1
breath 18:20

UHURU ROWE v. 3:18 HAROLD C. CLARKE
CARPENTER, LT. on 05/31/2019

**Brickhead** 12:16,22,24 13:1,4 24:13, 14,15,17 39:8,11,23 40:4,13 46:12,20 53:3 64:17 65:1,19 66:2 69:2

**bringing** 59:8

**brought** 9:17 10:23 13:20 14:1,10 40:19

UHURU ROWE v. 3:18 HAROLD C. CLARKE
CARPENTER, LT. on 05/31/2019

——————————————

**C**

——————————————

**call** 66:12,15,16

**called** 12:15 34:22 67:1

**care** 20:5 50:19

**Carpenter** 24:25 31:6 52:17

**case** 63:4

**censor** 13:5 14:3 15:3 26:14 27:18,19 29:22 35:17,20 36:3 40:15,25 41:7,15 46:4,10,11,13,17 47:3 65:24 68:20

**censored** 15:7 29:24 36:11,13,14 39:5,6,7,10 42:3,17,18,19,20,21,22 43:5 44:4,6,8,13,16 45:18,19 46:10 48:8,17 49:1 56:13,18 65:21 66:2

**censoring** 43:8

**censors** 21:7

**censorship** 46:23 47:7 62:23 65:17 68:25

**chance** 38:14,16,24

**characterization** 31:5,11,12

**charged** 37:24,25

**check** 11:8,12 22:3 51:24 52:25 62:18

**checking** 63:6

**choose** 27:7

**chow** 7:11,24

**circulating** 7:5,6

**circumstances** 41:14 51:18

**claims** 48:8

**clarified** 43:10

**clarify** 31:21

**class** 11:17

**client** 32:25

**commercial** 10:25 11:11

**commissary** 58:15

**communicate** 10:3,8

**communication** 29:20

**communications** 29:21 30:2

**community** 29:8,19 30:13,19 32:4

**compared** 9:15

**complaining** 58:12

**complaint** 42:9,11,13 43:7 47:6,13

**comply** 60:23

**computer** 10:11

**concern** 14:4,7,11 30:20 34:18 39:25 56:3 58:21 59:14 69:1

**concerned** 14:13 33:6 34:8 44:23 45:1 54:3

**concerns** 32:15 40:18

**concluded** 69:13

**condition** 21:20

**conduct** 6:2,4

**conducted** 37:13

**conducting** 18:22 23:14,20

**conducts** 12:17

**confinement** 37:12

**confront** 36:9

**confused** 20:4 27:20

**confusion** 56:23

**connect** 10:5

**connected** 10:1,2

**connection** 7:15 8:4 10:9,10 40:1 66:23,25 67:2,4

**considered** 63:7

**contact** 53:2

**contacted** 12:18 69:2

**content** 11:22,25 13:19 16:13 20:21, 22 21:8,9 22:7,19 23:1 28:16,23 29:2 31:9 44:4

**contents** 48:25

**continue** 68:20

**converse** 39:6

**copy** 8:9 16:14 18:24,25 60:1,4

**correct** 6:6,9,11 7:2,4 8:3,25 10:13 15:14,18 16:25 17:4,8,17 18:15 20:5,6 21:3 22:8,13,16,24 23:24,25 24:5,6,20 25:13,15,18,19,21,23 26:2,17 28:11 32:12,14 34:11,12 35:2,12,14,15 36:6 37:4 38:4,9,22 39:4 40:17 44:12,14,25 46:1,8,21,24 47:1,10,14,20,22 48:1,3, 6,14 50:11,13,14 51:4,5,8,12,15,17 52:3,7,12,20 54:18 55:15,20 57:24 58:2,25 59:1,3,22,23 60:14,15 62:10 63:19,20 64:6,8,10,12,14 66:22 67:6 68:4,6,8

**correctly** 60:10

**correspondence** 15:13 48:16,17 49:6,16,20,21 50:3 60:24

**count** 49:7

**country** 57:14,21

**couple** 26:23 60:3

**court** 16:7 18:19 50:2 53:13 55:6

**cover** 15:25 16:9 17:9 18:7 20:1,24 23:2,11,12 24:4 25:19 26:10,16 38:15 46:6 53:5 61:13,18,25 62:13,14,15,19, 20,21 63:1,4,5,6,9,11,21 64:7,11,16

**covered** 15:25

**covers** 17:10 18:3

**critical** 21:12,20 29:13,14,15,16,25 30:12,15,17,19 31:3,7,8,13,15,18,21, 22 32:1,5,6,9,11,18 33:2,7,12 41:18, 20,21 56:24 57:1,2,3,6,9,12,13,16,23 58:1,5,8,13,19,22,23 59:11,18,20

**criticism** 30:20 32:7 33:21 34:9

——————————————

**D**

——————————————

**D1** 42:7,8,9

**danger** 57:4,7 59:11

**Darden** 67:15,16

**date** 28:18 60:7

**day** 27:11 32:1 38:13,14

**days** 26:24

**Daytime** 16:12

**deal** 34:3

**dealing** 6:20,21,23 13:18,19 38:18 46:17 62:17

UHURU ROWE v. 3:18 HAROLD C. CLARKE
CARPENTER, LT. on 05/31/2019

Index: death..hall

**death**  21:11,20 28:24 31:19,25 40:1 59:6,8,12

**deaths**  21:10

**decision**  47:2,11,12 55:24 56:3,10,20 62:23,25

**decisions**  68:2

**Defendant's**  42:12 48:9

**delay**  55:24

**delayed**  38:7,10

**delays**  39:3

**department**  27:14 42:22

**depends**  30:5 46:16

**DEPONENT**  69:14

**deposition**  69:13

**died**  59:2

**difference**  43:9 57:25 66:11,14,15

**differently**  60:16

**dining**  53:10 54:13

**directly**  16:6 57:19

**Discouraging**  7:1,3

**discussed**  12:8 69:3,5

**distinction**  15:15,19

**distinguish**  29:20

**distinguishes**  30:9

**document**  9:12 43:12 44:4,24 45:1,7, 8,17 50:6 60:6,7

**double**  49:10

**draw**  15:19,21

**dropdown**  49:23

**due**  29:2 33:19 37:2,7 59:7,12

**E**

**E-ails**  31:7

**e-mail**  13:4 16:17,23 17:13,15 19:4 20:9 21:8 27:16 28:9 29:3,16 30:3 31:24 33:6 34:19 38:20 39:16 41:4,25 42:1,5 43:8 47:7 59:4 61:2 63:18 64:5 66:1

**e-mails**  10:12 13:21,24 19:9 23:18, 22,23 25:17 26:12,13,15,21 27:21,24

**28:**1,3,4,7 29:11 30:10 32:10 36:12 38:7,10 39:5 41:1 42:16 43:9 55:25 56:4,10,13,18,21 58:3,8,12 61:2,8,9, 14 63:16

**earlier**  28:25 56:25 61:14

**eat**  7:24

**eating**  7:10

**effective**  60:7,8

**employees**  6:10

**end**  54:15

**entered**  44:21

**entitled**  60:9

**essay**  28:17

**essays**  48:7

**eventually**  47:25

**everyone's**  14:20 63:18

**Exhibit**  42:13 43:7

**exist**  57:14

**existence**  6:12 8:1 25:12 52:18

**explain**  41:20 48:20 52:21 65:13

**explained**  23:3 37:22 52:23

**explanation**  39:2

**extent**  43:6

**F**

**facility**  14:18 48:18 58:6,9,13,19

**fact**  14:4 24:19 25:4 33:19 34:1

**fair**  57:5 59:20

**familiar**  15:10 17:3,5 42:14 59:23

**family**  21:15 29:17 59:14

**February**  6:16 52:19

**feel**  27:16 39:19

**felt**  34:6

**file**  9:8 47:18

**final**  48:2

**find**  31:14 44:18 45:22 49:4 50:6 53:3 68:25

**finding**  25:10

**findings**  23:21

**fine**  16:10,13

**finish**  24:21

**floating**  60:2

**Fogel**  24:22 25:2 31:10 32:21 33:3 42:7 49:25 60:1,6 62:3,5

**follow**  39:19

**food**  30:16 32:7 58:14

**forgotten**  55:4

**form**  18:21 49:14,17

**found**  22:14 27:1 29:18 31:13 35:13 54:19 55:10 57:1

**frame**  7:18

**frequently**  58:18

**front**  18:23 42:11 43:12 44:5

**fulfill**  50:7

**future**  35:3 48:23

**G**

**gain**  26:10

**gained**  37:19

**gave**  11:13 39:15 53:4 56:25 62:17

**general**  41:18

**generally**  17:6 51:2

**give**  12:10 18:16 20:1 25:3 34:19,24 39:20 40:14 58:11

**giving**  19:14 20:2

**good**  8:16 10:12 30:6,16 32:7

**governing**  60:23

**grievance**  47:15,19

**grievances**  68:3

**guy**  62:18

**guys**  53:22 54:19

**H**

**hall**  53:11 54:14

UHURU ROWE v. 3:18 HAROLD C. CLARKE
CARPENTER, LT. on 05/31/2019

Index: Handwritten..left

Handwritten 43:15

happened 32:6 59:9

happening 55:14 59:9

harm 29:18 31:23 57:4

harm's 21:21

harmful 29:7

he'll 49:4

head 48:4

headquarters 68:9

hear 31:20

heard 38:6 66:9

held 17:11

helpful 24:16

highlighted 50:25

hold 16:14,15 17:25 18:12

Holloway 67:21

hours 38:17

housed 58:19

hunger 53:10 54:13

hurt 7:12 21:16 53:16,25 54:1,15 59:15

**I**

idea 29:5 44:13

identify 43:12

II 21:22 33:7 37:23

impact 56:20

importance 31:8

incident 46:16 65:3

incidents 68:24

included 33:7 45:7

incoming 12:18 18:12 19:2,5,6,15 20:2,25 24:1 35:9 60:22,25 61:3 62:15,19 63:6,7,10,22,24 64:1 65:5

individuals 33:8

inform 54:11 55:24

informal 47:6,12

Informally 47:4

informant 54:8,9 66:10,20

informants 66:13,15

information 11:19 12:15,19,22,24 19:21,23 20:16 21:3,4 22:25 23:3,5,8, 21 24:15,16,18 25:3,10 26:10 29:25 33:7 34:14,16 37:9,19,20 39:14 62:12,13

informed 48:23 54:12

informs 49:22

inquiry 50:23

inside 6:22,24 13:19 21:8 28:23 31:23,24

inspection 48:9,16

instance 26:4 40:16 46:19 52:5 64:15

instances 38:6,20 64:11 68:10

institution 6:22,24 10:4 17:14 21:11, 14 31:15,16 32:11,19 33:8,12,21 34:9, 22 35:5 38:18 57:3 62:8

institutional 17:24 37:24,25 48:3

instructed 13:4 14:3 20:23 40:21 65:22

instructions 12:10 53:5

intake 47:23

intel 11:3,4,11,21,24 12:7,10,24 13:4, 15 19:21 20:16,23 24:13,14 26:14 27:9,14,15 34:21 40:20 42:22 52:23, 24 65:6,8,22 69:2,7

intelligence 13:16 15:19

interest 11:15 48:18

interesting 12:1,6 52:25

internet 9:18,19,22 10:1,6,7,9,10,11 11:5,13 13:9 20:8 21:18 22:10,11 51:22

interview 36:10

investigate 6:2,4 12:13

investigation 18:22 19:20 23:14,20 24:8,10 26:2 37:12,16 63:23 64:25

investigations 6:7 18:13

involvement 38:1

issue 46:2 54:7

item 65:20

items 46:10

**J**

Jay 36:2

jeopardy 29:4 32:3

Joe 30:5,16

Johnny 21:10,19 28:24 58:24

JP 10:16

JP5 10:5

Jpay 9:24 10:1,3,14 13:3,24 14:18 15:1 16:18,24 17:15,19,21,23 19:11, 13 20:8,9 21:8 22:23 25:17 26:12,13, 15,21 27:14 29:2 30:24 31:24 32:10 33:6 34:11 35:22,24 36:2,5 38:20 39:16 40:19 45:14 47:7 49:1,22,24 51:23 52:11 58:4 60:16 61:2,8,9,14, 19,22,25 62:8,16 63:3,14 64:4,5

JPAYS 14:2,11,12,15,21 18:2 19:25 20:2 21:7 25:9,10 28:19 30:23 32:12 35:8 40:21 46:6 51:10,11,13 62:16,20, 21 63:12 64:2,22 65:11 67:10 68:25

jump 32:24

juncture 35:10

**K**

kind 19:5

kiosk 10:2,5

knew 13:25 25:6,16,22 44:8 52:8

knowing 20:21 23:23

knowledge 21:24 52:5 55:23 56:2,9, 17,19

**L**

lawyer 66:9

learn 53:18 54:7

learned 20:22 21:2 25:8 26:9 53:17, 19 54:2

led 37:8 52:10

left 48:10

UHURU ROWE v. 3:18 HAROLD C. CLARKE
CARPENTER, LT. on 05/31/2019

Index: letter..option

**letter** 16:10 17:25 18:6,7 19:1 20:11, 18,19 22:9,11,21 23:2,11,17 24:4 25:19 26:16 29:2 43:13 44:7,9,11 46:6 61:13,18,25 64:7,16

**letters** 15:16,17 21:5 30:3 31:14 63:21 64:11

**level** 48:3

**Lieutenant** 62:7

**life** 21:20 29:3 32:3 59:10

**lines** 49:9,10

**list** 14:20 19:9 49:23

**listening** 38:4

**live** 32:22

**lived** 29:18

**log** 14:18

**long** 10:16 15:24 17:24 21:18 24:1 36:15 40:9

**looked** 11:9 22:7,10,14,17 26:21 39:5,24 53:1

**lots** 41:1

─────── M ───────

**machine** 10:2

**made** 67:4

**mail** 12:17,18 15:23,24,25 16:1,2,3,5, 8,9,11,12,16 17:6,8,9,10,11,12,19,22, 23,24,25 18:1,2,3,7,24 19:3,5,6,15 20:1,3,24,25 23:11,12 24:1 26:10 29:11 34:19 35:9,11,13 38:15 39:13 43:17,19 46:4 51:2,23,24 53:5 60:14, 17 61:13,15,16,17,18,20,24,25 62:12, 14,19,21 63:4,5,6,7,8,10,22,24,25 64:1 65:4,5

**major** 58:22

**make** 9:12 16:14 66:23,25 67:2

**making** 57:17,18,22 62:23,25

**manager** 12:16 24:14 39:9,12 53:3 59:7

**March** 6:14,16 8:1 52:18

**marked** 42:7

**marking** 44:20

**marks** 44:20

**material** 68:20

**matter** 11:16 26:1 49:13

**MAUGHAN** 9:11 18:20 24:21,23 31:5,11,21 32:5,20 33:1 42:4,9 43:6 49:14,17 50:22 52:15 55:4 60:1 69:12

**meaning** 10:17 57:10

**meaningless** 23:7

**meant** 10:11 35:1

**mechanically** 14:17

**medical** 58:14

**member** 21:15 29:21 40:1 41:5,15,18

**member's** 29:22 32:3

**members** 30:4

**mention** 34:10

**mentioned** 31:3 33:9 39:25 41:4 53:7 58:24 68:17

**messages** 58:4 60:16,22,25 61:19,25 62:8

**messaging** 60:10,13

**Mills** 21:19 29:18 30:18 31:18,23 59:7,8,13,16,21

**Mills'** 59:6,10

**mind** 14:4,7 15:15

**miscommunication** 33:1

**mistaken** 45:14

**move** 58:23

─────── N ───────

**named** 58:24

**names** 28:20,23 29:22,24 30:4 34:10 40:1 44:24 45:2,7

**naming** 21:10,11 29:4 32:2 33:19 34:2 48:21

**Nancy** 69:10

**needed** 11:8 26:9

**night** 16:6,11 17:2 48:4

**normal** 26:1

**note** 32:10

**notes** 9:13 28:6

**notice** 41:19

**notification** 49:3

**number** 9:3 50:18,20 55:11,12

**numeral** 60:9

**numerous** 8:12

─────── O ───────

**object** 24:23 43:6 50:22

**objection** 31:5,10 49:14,17

**obligated** 49:19 50:2

**obligation** 50:7

**occurred** 65:3

**October** 60:7

**offender** 8:18 11:12,19 15:13 16:6,9, 11 18:21 19:14 21:13 23:12 30:18 31:18 37:20 48:16 53:24 54:9,11 58:24 60:14,16

**offender's** 16:16 17:10 28:24 29:17 31:25

**offenders** 7:8 8:12,14 33:25 37:11 53:10,15 54:14 55:9,10,21 58:18 59:24 61:2

**offenders'** 29:3

**office** 12:5

**officer** 11:3,4,11,21,24 12:7,25 13:4, 15 15:20 19:21 20:16,24 24:13,14 26:14 27:9,15 40:20 47:23 52:23,24 65:6,8 69:2,7

**officers** 7:11 12:11

**ongoing** 18:13 19:20

**OP** 50:12 59:23 60:5 61:12

**open** 39:1

**opening** 63:23

**operating** 15:10 60:20

**operation** 10:14 48:17 60:24

**operational** 12:16 24:14 39:12 53:3

**operations** 39:9

**opinion** 50:5 65:17,19

**option** 21:17

UHURU ROWE v. 3:18 HAROLD C. CLARKE
CARPENTER, LT. on 05/31/2019

order 48:18 51:13 54:17 63:9 65:10

outgoing 12:18 17:5 18:12 19:3,5,6, 8,15 20:3,25 24:1 34:19 35:9 39:13 51:2 60:22,25 61:3,15 62:15,19 63:6, 7,10,22,24,25 65:5

UHURU ROWE v. 3:18 HAROLD C. CLARKE
CARPENTER, LT. on 05/31/2019

P

P-e-r-k-e-r-s-o-n 69:8

p.m. 69:13

pages 49:7 50:17

paperwork 19:14

Pardon 8:13 35:18

part 31:19,25 42:7 60:12

party 35:4

pass 23:21

passed 16:11 24:15,16,18

past 15:5

pending 18:22

people 8:11,24 15:17 21:10,22 27:23 29:4,12 31:1 33:20 34:2 48:21 53:25 55:19,21 67:5

Perkerson 69:8

permission 17:11 19:2,6,8,14 20:1,2 23:22 24:1 35:7 39:15,20 40:14 46:11 51:24 62:9 63:16,19,24

person 30:21,22 56:18 58:5

person's 21:15 30:24

persons 19:9

pertaining 21:3,5

petition 6:18,19,20,23 7:5,16,24 8:2, 5,6,7,9,17,19 9:5 37:3,4,7,8,10 53:7,9, 11,14,17,18,21 54:2,20,23 55:1,7,9, 10,17,24 56:2,9,14,20 65:23 67:3

phrase 57:2,3

pick 28:9,12

picked 27:12

Plaintiff's 43:7

player 10:5,16

point 67:14,17

policies 49:23 50:16

policy 49:2,4 61:24

polite 24:24

political 57:13

possibility 54:3

possibly 57:6

postal 16:15 43:19 60:14,17 61:16

posted 11:14

potential 54:23 55:7

practice 61:18

precautions 54:6

present 13:14

president 57:13,20,23

prevented 32:3 59:7,8,12

print 41:23

printed 38:21 40:6,13

prison 6:5 11:1 13:17,20 21:25 32:11 56:14

prisoner 10:15 47:18

prisoners 6:7 9:19 13:22 15:16 18:14 21:23 29:11 30:2 49:19 50:3

problem 9:10 28:10,13 29:9,10,23 38:18 62:17

problematic 35:14

procedure 15:11 47:16 49:2,4 50:16, 21 60:20,24

procedures 48:17 49:23

produced 9:9

production 9:12

prompts 26:2

proof 63:5

property 8:18,20 37:21,22

prosecution 37:16

protect 63:1

protection 33:23,25 64:13

provided 26:13 60:6,24

provision 11:16 60:6,22 64:21

public 21:12

Pughsley 37:2,9,20

Pughsley's 8:18

pull 10:7 43:2

pulled 40:12

purpose 42:14

put 18:23 20:24 26:10 37:8 40:8 59:10,11 62:12,18

putting 20:19 21:13,16,20 23:12 29:3 30:1 32:3 57:7,18

Q

question 7:25 34:4 49:18,25 55:4,25 56:8,11 60:3 66:1,7 69:4

questions 24:25 52:13 62:2 66:8 69:11

quickly 46:3 52:1

R

rad 16:21 35:13

raised 68:25

ran 11:19 29:13

Ray 26:19

read 12:2,6 13:3,6 14:14,21,22,23 15:23 16:2,5,9,10,12,17,19,23 17:12, 13,21 18:2,5 19:2,7,8,15 20:2 21:17 22:19 23:25 27:3,12,16,21,24 28:2,3,4 33:6 35:10 38:13,14,24 41:1 42:23 43:3 45:15,16 48:15,17 49:25 53:2 55:5 59:15 60:10,20 61:8 64:5 65:10

reading 19:13,25 21:7 28:6 62:16

reason 17:7 21:1 24:9 49:15 51:3,6 52:2,4 55:2

reasonable 17:9 18:1,4,13 19:13 23:25

recall 7:17 26:20,22,25 28:15,18 30:23 31:24 34:15 36:12,14,16,17 37:21 41:8,10,13 42:6 45:13,21,24 53:20 58:12

receive 16:1 48:25

received 12:19,22,24 19:21 20:16 23:3 37:9 49:2

receiving 62:13

recently 59:2

UHURU ROWE v. 3:18 HAROLD C. CLARKE
CARPENTER, LT. on 05/31/2019

Index: recollection..speaking

recollection 59:4

recommending 36:18

redirect 33:3

referring 36:4

refers 36:5

Regional 67:24,25

regular 14:24,25 17:19,21,23 43:19
47:19 61:15,20

regularly 65:16 66:5

regulations 60:23

reject 68:15

rejected 48:18 49:21,22

rejecting 49:16,20 50:3

relationship 54:22 55:7

relevance 50:22

rely 9:13

relying 50:20

remember 31:1 36:18

repeat 16:7 55:3

reporter 16:7 18:19 50:2 53:13 55:6

reporting 54:16

request 9:12 44:21

require 61:24

respect 6:21 19:16

respond 47:9

responded 50:10

responding 47:12

response 13:1 16:7 48:7 66:8

responsibility 47:9

retrieve 40:10,11

reverse 68:7

review 22:23 23:22,23 35:7 43:20
55:25

RHU 37:12

riot 7:10,13,18,19,20,22,23 53:9,17,18
54:3,4,5,7,12,17,23 55:2,8,23 56:3,9,
14,20 66:21 67:1

riots 6:20,23 53:8,22

risk 48:21

role 37:18

Roman 60:9

room 12:18 16:12 18:24 39:13 63:25
64:4,5

Rowe 6:13 7:15 8:6,10 11:7 14:7
18:21 19:17 20:14,15,23 21:24 23:12
26:9 27:21 30:11,12 36:9,10,15,18
37:10 38:6 39:24 46:19 48:8 51:6
52:5,22,24 55:17 58:12 62:12 65:20
66:23,25 68:16

Rowe's 8:1,4,22 9:1,14,17 11:12,19
20:24 34:9 37:20,21 38:3 41:1 52:18
53:19 55:25 56:4,10,13,21 58:3 59:4
62:16 66:1

rumor 66:9

run 29:9

Ryan 10:23,24 11:24 12:21,23 13:15,
16 19:22 20:16 24:16,18 52:23

Ryan's 11:15

## S

safety 21:13 53:15,24

SAITH 69:14

schedule 38:17

screen 61:4,9,14,19,23 63:14

screened 60:22 61:1,2

screening 62:10 63:12 64:23

search 18:1 52:1

searched 17:6 37:20 51:3

searching 8:18

section 50:25 60:9,13,14,20

secure 60:10,12

security 15:2 27:17,18 28:10,11,17
34:16,17,19,21,23,24,25 35:19,21,23,
25 36:1,2,3,4,5 39:1 40:3,7,8,10,11,
12,23,24 41:19,22 44:20 48:19 58:21
65:25

select 14:22 61:5

selected 64:24

selectively 61:6

send 13:4 14:3,23 18:22 28:9,10,11
29:14,15 30:5 35:23,24 36:2 38:19
39:15,21 40:15,22 41:19,22,23 46:18
51:25

sending 9:16 13:24 14:20 20:18
29:11 51:22 52:10 64:4

sends 20:10

sensor 36:12 41:17 65:25 66:3

separate 34:22 35:5 60:13

Service 16:15

set 7:20,23 53:9

share 40:18

show 42:12 45:8

sides 49:10

sign 8:6,10 18:23 23:12 24:2 37:11

signature 9:4 48:10,13 55:10

signed 7:17 8:11 18:8,18,24 53:6
55:9,17 67:5

signing 8:7

signs 23:17

simple 49:13

simply 47:12

single 49:9,10

sir 8:21,23 9:3,25 10:21 13:9 15:12
17:2,23 19:18 21:24 22:2,4 24:11 27:2
28:5,8,14 29:10 30:23 36:8,14 44:10
45:5 49:12 50:8,24 51:1,10 67:18,20
68:1,14

sit 7:11 10:7 38:25 44:15

sitting 19:12 38:3

situation 24:11 48:21 58:24

slow 18:19,20 24:25 53:13

snitch 66:9,10,18

snitches 66:12

society 29:6

sound 52:19

spaced 49:10

speak 36:15 40:4

speaking 57:16

UHURU ROWE v. 3:18 HAROLD C. CLARKE
CARPENTER, LT. on 05/31/2019

Index: special..walk

special 9:1

specific 18:14 42:5 46:9 63:16

spoke 26:20 28:24 39:8 46:19

spoken 65:16

staff 6:2 21:1,2,9,11,16,25
21,22,24 30:1,4,13,21,22,24 32:2,3
33:25 40:1 41:5,15,18 53:15,25 54:14
56:14

stand 9:14

standard 16:21,22

standing 21:15

start 20:12 22:14 53:4

started 8:1 9:16 19:24 21:6 25:9
26:12 40:20,21 64:22

starts 26:14

state 9:3 11:1 21:25 55:10,12

statement 57:22

States 61:16

stating 17:25 19:14

stays 27:19

stepped 21:6 53:16

stop 14:3 32:21 54:17 56:3,10,20
68:22

stopped 58:4

storage 15:1

straight 38:19 40:22 61:22

straighten 33:5

strike 53:10 54:13

stuff 7:11 13:19 34:1 67:3

subject 19:9

subsequent 68:24

substance 25:14

suffices 50:5

supervises 12:17

supervisor 65:4

suspect 52:10

suspicion 17:1,7 18:2 19:13 24:3
51:3,6,13 52:2,4

suspicions 17:10 18:4,13 23:25

suspicious 15:24 17:12,14,18,19
19:9 20:14,15 23:18 51:20,21

Sussex 9:20 11:1 21:22,25 31:4
32:11 33:7 37:11,23 67:19

system 44:20

**T**

taking 54:6

talk 30:16 31:25 39:24 46:12 58:14
66:21 68:16

talked 54:20

talking 7:10 21:10 28:19,23 32:13
42:2 43:7,8,10 61:13 64:15

talks 60:14

target 61:7

teacher 10:25 11:10

teaches 10:25

telling 8:2 11:3 23:5 49:1 54:16

terms 57:17

testified 31:6,9 52:17 56:12,25

testify 38:6

testimony 31:6,12 38:4 52:21 56:25

thing 7:21 35:24 65:24 68:9

things 12:13 15:7 21:5 31:3 55:14
57:1 58:17,18

thinking 53:23,24 57:5 58:3

thought 7:21 10:10 21:12 28:12
29:25 30:18 35:14 39:25

threat 29:7 57:17,19

threats 41:21,25 57:4

thrown 38:18

time 7:18 13:14 16:11 18:1 25:25
26:18 45:15 46:23 52:9 53:11,14 54:2,
19 55:1,15 56:13 60:5 64:23 68:17

times 39:3 68:24

tired 56:1

today 27:15,16

told 11:2,7,11 12:7 19:25 23:5,8,11,19
26:11 34:8 46:12 49:6 53:2 66:21

67:14 68:19,22 69:2

tone 24:24

top 39:12 65:4

totally 17:20 20:8

track 20:1

trained 15:16

Trane 28:24 30:18 58:25 59:2,5

Trane's 21:11,19 31:19 59:12,14

transfer 10:6

treated 60:16

trouble 24:22

true 59:15

truth 32:23

type 10:19 46:16 51:23

typed 13:12

**U**

U.S. 43:19

Uh-huh 22:18 35:6 46:14

uncomfortable 34:6

underlying 24:9

understand 22:12 31:9 36:4 39:6
47:15 66:17

understanding 32:8 56:17

unit 15:1 27:10 59:7

United 16:15 61:15,16

uphold 68:5,12

URL 13:10

**V**

violate 52:11

violation 49:2,23 50:12,15

**W**

wait 18:23

waiting 21:15

walk 21:14

UHURU ROWE v. 3:18 HAROLD C. CLARKE
CARPENTER, LT. on 05/31/2019

**walls** 6:5,8

**warden** 12:17 18:10 22:9,21 23:2,21,
22 24:3,7 25:6,20,22 26:16,18,21
34:13 35:7 46:7,9,11 47:25 48:2 62:24
67:17,19 68:16

**Warden's** 18:14

**water** 58:14

**web** 35:23

**website** 11:13 13:10

**weeks** 26:23 38:8

**whichever** 27:10

**wind** 29:17

**word** 33:2 48:2

**words** 56:24

**work** 30:17

**working** 63:3

**works** 27:24

**write** 58:18

**written** 60:23

**wrote** 50:9

─────────────────────
            **Y**
─────────────────────

**years** 15:5

UHURU ROWE v. 3:18 HAROLD C. CLARKE
CARPENTER, LT. on 05/31/2019

*Halasz Reporting & Video  |  804.708.0025*
*PO Box 1644  Richmond, VA 23218-1644*