Rowe v. Ray
Civil Action No. 3:19cv418

# EXHIBIT H

1/9

Life at Sussex 2 State Prison - Revisited
By Uhuru B. Rowe
May 29, 2018
E-mail: uhururowe76@yahoo.com

Well, it finally happened! The harsh and overly oppressive conditions we are subjected to a Sussex 2 State Prison (S2SP), which I described in a similar-titled post back in December of 2016, made the front page of a mainstream newspaper. But it didn't get there without sacrifice. Dale Lee Pughsley, also known as Askari Danso, upon arriving at this maximum security prison in March of this year, was appalled by the level of passivity among the prisoner-class in the face of inhumane prison conditions. And so he did what any politically-active prisoner would do when confronted with similar circumstances: he organized others to peacefully challenge those conditions by filing complaints with the prison's grievance department. As expected, retaliation was swift. On April 24, while on his way back to his cell from the prison's law library, he was accosted and shackled by guards and immediately shipped across the street to Sussex 1 State Prison - a level 5 security prison - and placed in solitary confinement. Because he is supported by several activist and human rights groups the Coalition for Justice and the Defenders of Freedom, Justice and Equality, his ordeal made headlines in the Richmond Times-Dispatch on May 7. The front-page article, titled "Politically Active Va. Prisoner Moved Three Times Since '16", allowed Askari to expose conditions like poor water quality, substandard medical care, and overcrowding. He was quoted as saying that S2SP "is the worst prison in the state". I agree!

I first expounded on the general layout and design of

S2SP back in December of 2016 in a similar-sounding post titled, "Life At Sussex 2 State Prison". I feel that this post nor the Richmond Times-Dispatch are delved into enough detail about the specific nature of the conditions here at S2SP. While it may not be exhaustive, I hope the account below will give a more detailed analysis of what it is we're dealing with:

1) Critical understaffing. S2SP is so critically understaffed that, for the last six months, prison authorities have resorted to bussing in guards from other prisons across the state to temporarily fill vacancies. This critical understaffing has resulted from guards quitting due to a toxic work environment created by Warden Tracy S. Ray*, Assistant Warden T. Darden, and Operations Manager T.L. Birckhead; as well as several guards being terminated because of misconduct. Standard 4-4052 of the American Correctional Association, the nations largest corrections association and accreditation agency, recommends that the vacancy rate of a prison not exceed 10 percent. We have estimated that the vacancy rate here at S2SP exceeds 30 percent. There are days when only three guards are on duty in a Housing Unit which houses 352 inmates. As a result of this critical understaffing, our out-of-cell recreation has been curtailed, resulting in days when we're locked down in our cells for as long as 20 hours a day. Because critical understaffing was one of the main contributing factors of the 7-hour riot at the Lee Correctional Institution in Bishopville, South Carolina, on May 16, 2018, which left 7 inmates dead and over 20 others injured, our safety and security are also in danger because of critical understaffing levels here at S2SP. In order to remedy this problem, S2SP

must be shut down, or at the very least, the prison population must be significantly reduced.

2) Unnecessary and underreported deaths. Since November of 2016, over 12 incarcerated citizens have died here at S2SP. None of these deaths were reported to, or in, the media. In one instance, John Tran — a good friend of mine — was beaten to death during a reportedly hour-long confrontation with his cellmate in 2017 after several requests he made to be moved to another cell were denied by Housing Unit #2 Manager, J.F. Mills. Had Mills granted Tran's request to be moved to another cell, he would still be alive! The deaths (and the causes of deaths) of people in prison are always shrouded in secrecy because the neglect of prison authorities in performing their duties in a professional and ethical manner is the cause of most of these deaths, like in the case of Tran. In the interest of transparency and accountability, it is necessary that the VADOC hold quarterly press conferences to release the names of the incarcerated people who have died and their cause of death to the media and the general public.

3) Unhealthy and nutritiously deficient diet. Prison staff at S2SP are fed fresh fruits and vegetables on a daily basis in the staff dinning area while the same is denied to its incarcerated citizens. Such a poor diet, deficient in adequate vitamins and minerals, causes malnourishment, lethargy, depression, fatigue and other physical/psychological side effects which constitute cruel and unusual punishment. As a general practice, we are served artificially flavored/sweetened juice and stale cake as a

substitute for fresh fruits. On those rare occasions when we are served fruits and vegetables, they are either rotten, spoiled, overly steamed, or beyond their expiration date—leaving them with little to no nutritional value or health benefits. In order to remedy this matter it is necessary that we be provided with a healthy and nutritious diet, complete with fresh fruits and vegetables, which is indispensable to the growth, development, and proper functioning of a healthy human being.

4) Contaminated and discolored drinking water. Incarcerated citizens at SASP are forced to drink water that is brown, foul-tasting, and foul-smelling as a result of it being contaminated with dirt and high levels of rust, lead, iron, maganese, and other unknown contaminants. Each time we have complained about this water, we are told it is safe to drink. The fact that prison employees are advised not to drink this water (and are in fact issued free bottled water) and because of the negative side effects we experience after drinking it (e.g. nausea, cramps, headaches, diarrhea) this is evidence that the water at SASP is unsafe and is putting our lives and health at risk. Denying any human being—including those of us in prison—access to clean and safe drinking water constitutes cruel and unusual punishment. In order to remedy this matter, SASP must distribute bottled water—free of charge—to its incarcerated citizens on those days when the water turns brown. Furthermore, the Environmental Protection Agency and the Virginia Department of Environmental Quality must begin conducting joint tests of the water at SASP on a quarterly basis to determine if the water is indeed safe to drink with the results of any findings released to its

Life at Sussex 1

.Uhuru
5/9

incarcerated citizens, the media, and the general public.

5) Biased and ineffective grievance procedure. The grievance procedure at SASP is inherently biased against those incarcerated citizens who utilize it to lodge complaints and grievances to redress staff misconduct and other instances of mistreatment, neglect, and human rights abuses. It is standard practice for the various Office Service Specialists (OSS) and the Grievance Coordinator, A. Critton, to not issue us Grievance Receipts for our Informal Complaints and Regular Grievances. Our Informal Complaints and Regular Grievances are sometimes thrown in the trash and our Regular Grievances are routinely rejected by A. Critton for bogus reasons (e.g. they were filled out wrong). All of these practices occur with the full knowledge and consent of Operations Manager, T. Birckhead- who oversees the grievance department here at SASP- for the purpose of maintaining a strict code of silence and secrecy among SASP employees; covering up staff misconduct and other instances of mistreatment, neglect, and human rights abuses; shielding SASP employees from accountability; and hindering incarcerated citizens from filing state/federal civil suits against SASP employees. (Before incarcerated citizens can file a civil suit against SASP employees, the Prison Litigation Reform Act requires us to first exhaust all available administrative grievance remedies and appeal them to the highest level. We cannot exhaust these remedies, however, if our Complaints and Grievances are thrown into the trash or our Regular Grievances are rejected by the Grievance Coordinator for bogus reasons). In order to remedy this high level of corruption surrounding the Grievance Department here at SASP, it

is necessary that a Independent (non-VADOC employed) Grievance Coordinator be established to receive and investigate any allegation of staff misconduct, mistreatment, neglect, and human rights abuses alleged to have been perpetrated/committed by any prison employee and shall report any findings of fact and conclusions of any investigations directly to the Governor of Virginia.

6) Group punishment. It is standard practice at S2SP - a practice approved and sanctioned by Warden Tracy S. Ray - to punish all incarcerated citizens as a group because of the misbehavior of one or more people. If there is a disturbance (i.e. a fight) between two people in a pod, the entire pod or housing unit is placed on lockdown and any privileges earned, via the Evidence Based Practice-Individual Incentive Plan, are revoked for an extended period of time even after those responsible for the disturbance have been placed in segregation. If a weapon is found during a search of a cell, the entire pod or housing unit is placed on lockdown even after the person responsible for the weapon is removed and placed in isolation. Warden Tracy S. Ray and former Assistant Warden M.A. Bailey even distributed a July 29, 2016 memo advising us that in-person contact visits with our loved-ones will be cancelled for an entire pod or housing unit based on the number of people testing positive for drugs, possessing drugs, or conspiring to possess drugs. What these instances show is that whenever one or more individuals break prison rules, we are punished as a group. However, VADOC Operating Procedure (OP) 866.1 forbids us from submitting group complaints a petitions to redress our grievances. Instead, we are instructed to redress our grievances as individuals although we are consistently

Life at Sussex 2

-Uhuru
7/9

punished as a group. This is unfair, unjust, and violates prison policy set forth in the Offender Orientation Manual (2018) which states that individual rights and privileges shall not be revoked "without cause". Also, holding the majority of us accountable for the misbehavior of a few individuals fosters an environment where a potentially violent conflict can arise between those complying with prison rules and those who do not. (Those who comply with prison rules may view those who do not as the cause of their discomfort as a result of the rollbacks to the privileges, with both sides increasingly becoming antagonistic towards each other). Creating such a potentially volatile prison environment violates policy as set forth in the Offender Orientation Manual (2018) which says that "The function of Sussex 2 State Prison is to provide a safe and secure environment...." This shows that group punishment 1) unfairly and unjustly punishes the prison population as a whole for the "misbehavior" of a few individuals; 2) results in our individual privileges being rescinded without cause or due process; and 3) fosters an unsafe environment where there's potential for violence. In order to remedy this problem, it is necessary that S2SP immediately cease its use of group punishment.

7) Inadequate/substandard medical care. Medical services here at S2SP are contracted out to a private, for-profit corporation known as Armor Correctional Health Services, Inc. (Armor). This contract is based on the "capitated financing" scheme where Armor receives a fixed amount of money, per prisoner, from the VADOC regardless of the medical treatment required. This scheme allows Armor to predict its level of profits based on the level of care

it provides to incarcerated citizens. In other words, the less treatment and care Armor provides, the greater its profits. Predictably, this capitated financing scheme — which was exposed in the federal case of Scott v. Clarke, 2014 WL 6609087 (W.D.Va. 2014) — incentivizes substandard medical treatment/care and has resulted in the systematic denial of an appropriate level of treatment and preventative care, including, but not limited to: delayed responses to our sick call requests; delays in the diagnosis and treatment of illnesses; failure to make referrals, or delays in making referrals, to outside specialists; failure to carry out a specialist's prescribed course or method of treatment; and an almost complete denial of dental treatment/care due to the unavailability of a permanent dentist/dental hygienist. As the U.S. Supreme Court held in Brown v. Plata, 131 S.Ct. 1910, 1928 (2011), "Prisoners are dependent on the State for food, clothing, and necessary medical care. A person's failure to provide sustenance for inmates may actually produce physical torture or a lingering death." Because substandard medical care at SASP often results in our physical torture and lingering death, it violates the 8th Amendment's ban against cruel and unusual punishment. In order to remedy this matter, it is necessary that SASP immediately end its medical services contract with Armor based on the "capitated financing" scheme which puts profits over human lives

8) Denial of Formal Due Process Hearings. It is standard practice at SASP to deny all incarcerated citizens in the Restrictive/Special Housing Unit the right to appear at a Formal Due Process Hearing before the Institutional Classification Authority (ICA) in order to know the reason(s) why we are placed in the Restrictive/Special Housing Unit; call witnesses; speak in our defense; be apprised of the

Life at Sussex 2
Uhuru
9/9

reasons for any decisions rendered by the ICA; and to receive a copy of any written findings and recommendations of the ICA — all mandated by O.P. 830.1. In order to remedy this matter it is necessary that SaSP comply with O.P. 830.1 and the Due Process Liberty Interest protections enumerated in the 14th Amendment to the U.S. Constitution by allowing us to physically appear at all Formal Due Process hearings before the ICA.

So, there you have it. Anyone with a basic knowledge of the prison struggle from '60s onward knows that the conditions described above have eventually led to violent prison uprisings — like at Attica Correctional Facility on September 9, 1971; at the Southern Ohio Correctional Facility on April 11, 1993; and most recently, at the Lee Correctional Institution on April 15, 2018 — if not properly remedied. Knowing that the harsh, overly oppressive, and inhumane prison conditions often results in violence in prisons, why is it that prison officials refuse to remedy these conditions? Is it because they need the violence to rationalize the legitimacy of the police state and the existence and/or construction of these max/supermax prisons or is it because they simply don't give a damn about the welfare and wellbeing of the human beings trapped behind these walls? I maintain that it is all of the above!

\* After years of complaints and recent media exposure about the conditions highlighted above, three weeks ago, Tracy S. Ray was finally removed as Warden here at SaSP. While this is a huge victory for us, so far, the above conditions still exist